851 F.2d 714
 Russell T. JACKSON, Plaintiff-Appellant,
v.
Toni V. BAIR; Fred E. Jordan, Jr., Regional Administrator,
Virginia Department of Corrections; E.C. Morris;
Edward W. Murray; Allyn R. Sielaff,
Defendants-Appellees.
 No. 87-3827.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 5, 1987.
Decided July 13, 1988.
 
 Widener, Circuit Judge, dissented and filed opinion.
 Gerald Thomas Zerkin (Zerkin, Heard & Kozak, Richmond, Va., on brief), for plaintiff-appellant.
 William W. Muse, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen. of Virginia, Mark R. Davis, Asst. Atty. Gen., Richmond, Va., on brief), for defendants-appellees.
 Before WIDENER and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Russell T. Jackson, a state corrections officer, brought this Sec. 1983 action against Allyn R. Sielaff, Director of the Virginia Department of Corrections, Toni Bair, Warden of the Mecklenburg Correctional Center (MCC) where Jackson was employed, and other Department of Corrections officials, alleging that these state officials had violated his first amendment and procedural due process rights by first suspending, then transferring, then discharging him because of his criticism of departmental policy and practice. The district court granted summary judgment in favor of all the defendants. On Jackson's appeal raising only his first amendment claim, we affirm as to Sielaff; but reverse and remand for further proceedings as to all the other defendant officials because we believe that summary judgment was not proper on the first amendment claim as to them.
 
 
 2
 * During the relevant period, Bair was the warden at MCC, where Jackson was employed, Jordan, Morris and Murray were superiors of Bair's in the Department of Corrections and Sielaff was its Director.[1] Jackson was specifically assigned as a commander of the Prison Emergency Response Team (PERT team), which was designed to respond to inmate disturbances at MCC. On a day-to-day basis, the PERT team undertook special tasks, such as the supervision of inmate recreation.
 
 
 3
 On February 6, 1985, Jackson joined a table of employees having lunch in the staff dining room. One of those seated at the table was Martha Williams, a Department of Corrections employee visiting MCC to conduct certain training exercises. During the course of a conversation between the employees at the table, a question arose as to Warden Bair's approach to running MCC. There is a dispute as to just how the question arose. According to Jackson, Williams asked him his opinion of Bair's programs. According to Williams, Jackson was talking to others at the table when she overheard his remarks. However prompted, Jackson concededly expressed his displeasure with what he thought were Bair's lenient policies towards the inmates, comparing them to the unsuccessful policies of a previous prison administration. Though his exact words are in dispute, Jackson went on to predict that if such policies were continued, there would be a disturbance at MCC within six months. At this point, further dispute exists. According to Williams, Jackson went on to state that when the disturbance occurred, he was going to sit back and watch it happen. According to Jackson, he did not make this added comment. There is also dispute as to whether any inmates were in a position to overhear the discussion. Prison regulations in effect at the time barred inmates from the dining area during meals. Nevertheless, according to Williams, inmates were permissibly present in the adjoining kitchen and tray collection areas. The tone and loudness of Jackson's comments are disputed. According to Williams, Jackson spoke in a loud and agitated fashion capable of being overheard by others in the dining room. Jackson denies having talked in a raised voice. An investigator's report of the incident is also inconclusive. One person present stated that Jackson spoke in his normal voice, which was loud. Several others, however, stated that Jackson was not talking in an unusual or loud manner. At least one observer noted that Jackson was upset when he came into the dining hall because the inmates had been granted 30 minutes extra recreation time.
 
 
 4
 Later that same day, Williams reported her version of the incident to Bair. Jackson was then summoned to Bair's office and confronted with the story. He admitted to generally criticizing Bair's policies, but denied saying that he would sit back and allow a riot to happen at MCC. Jackson also told Bair that he was a loyal employee and was not attempting to cause trouble, but rather was simply talking privately to some co-workers. Bair nevertheless handed Jackson a previously prepared letter notifying him that he was suspended pending a further investigation of the incident.
 
 
 5
 Some two hours later, Jackson returned to MCC to retrieve some personal items. At this time he was given a second letter from Bair which rescinded his suspension and instructed Jackson that he was being transferred to the Nottoway Correctional Center. Still later that day, a third letter was delivered to Jackson's residence and this letter instructed him that his transfer was being changed to the Virginia State Penitentiary (VSP).
 
 
 6
 Jackson then met at intervals with the various Department of Corrections officials named as defendants, to protest his transfer and discuss the prospect of changing it. Jackson was advised by some, including Sielaff, to try the new assignment and report to VSP. Jackson, however, refused to report to VSP, claiming that his life would be in danger. Instead, he filed a grievance under state law, pursuant to which he requested that Sielaff order a panel hearing to examine his transfer. Sielaff ruled that a panel hearing was not warranted under state law, but this decision was later overturned by a state court. In the interim, Jackson had been terminated, allegedly as a result of his refusal to report to his new post. As a result, the grievance panel considered this issue as well as his suspension and transfer. The grievance panel ruled in favor of Jackson, and he was returned to MCC, though he apparently was not reinstated as a commander of the PERT team. In October of 1986, Jackson resigned from employment with the Department of Corrections.
 
 
 7
 Jackson filed this action a short time before his resignation, claiming that the appellees' actions violated his first amendment and procedural due process rights. Upon cross motions for summary judgment, the court granted the defendant-appellees' motion, concluding that Sielaff had no direct part in any of the challenged actions and denying the first amendment and due process claims on the merits as to the other defendants. This appeal followed. On it, Jackson only challenges the denial of his first amendment claim.
 
 II
 
 8
 The issue is whether Jackson's first amendment claim was properly rejected by summary judgment. More specifically, it is whether on the summary judgment record before the district court there were undisputed facts which established as a matter of law that no violation of the claimed right had occurred. Fed.R.Civ.P. 56(c). The district court thought so, but we, reviewing the same record freely, see Smith v. University of North Carolina, 632 F.2d 316, 338 (4th Cir.1980), disagree. We believe instead that there remain on that record genuine issues of fact material to resolution of the first amendment claim which precluded entry of summary judgment for the defendants.
 
 
 9
 We emphasize at the outset the complexity, both legally and factually, of the specific constitutional right at issue and of any claim based upon it. The right is that of a public employee not to have his employment conditioned upon refraining from speech that is under general protection of the first amendment. Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). The elements of the right, hence of any claim of its violation, are subtle and difficult of application, precisely because of the obviously conflicting interests and values involved in the public employment relationship. Those elements, though difficult to apply in detail, are by now well-settled in general formulation, and may be briefly summarized.
 
 
 10
 To be protected in this special way, public employee speech must in the first place be upon a "matter of legitimate public concern," Pickering v. Board of Education, 391 U.S. 563, 571-72, 88 S.Ct. 1731, 1736, 20 L.Ed.2d 811 (1968), rather than upon a matter of purely private concern about the employee's own conditions of employment or personal circumstances. See Berger v. Battaglia, 779 F.2d 992, 998-99 (4th Cir.1985). Even if the speech is upon a matter of legitimate public concern, it is not protected if the public employer's "interest in the effective and efficient fulfillment of its responsibilities to the public" outweighs the employee's interest in free expression of the particular ideas. Connick, 461 U.S. at 150, 103 S.Ct. at 1692; Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. And, of course, the right is only violated if its exercise is the effective cause of the challenged employer conduct, in the sense that the conduct would not have occurred but for the speech. Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (even if discharge based in part upon protected employee speech, no violation if it would have occurred in any event for reasons unrelated to exercise of the right).
 
 
 11
 Both the "public concern" and "interest balancing" elements of this special first amendment right present difficult problems in application. The balancing element in particular requires great subleties of judgment in weighing the conflicting values and interests at stake. This is so because both "public concern" and "public employer interests" are relative notions, varying in kind and degree in different situations. For this reason this balancing inquiry must take into account the particulars of each in the case at hand. Connick, 461 U.S. at 150, 103 S.Ct. at 1692 ("particularized balancing" required, although "difficult"). For while speech that "touche[s] upon matters of public concern in only a most limited sense ... does not require [a public employer to] tolerate action which he reasonably believe[s] would disrupt the office, undermine his authority, and destroy close working relationships," 461 U.S. 154, 103 S.Ct. at 1693, other speech concededly disruptive of these interests might nevertheless be protected precisely because it directly touches upon matters of grave public concern. See, e.g., Pickering (open criticism of public employer's allocation of public funds and method of informing public of revenue needs). Furthermore, where the public employer's retaliatory action is taken in response to merely threatened rather than actual disruption of employer interests, the reasonableness of the employer's perception must be weighed in the balance. For though protection of the right does not require the public employer always to await actual disruption before acting, see Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir.1984), it does require that action taken in response to a mere potential for disruption be objectively justifiable under the circumstances, see id. ("damage to morale and efficiency [must be] reasonably ... apprehended"). Otherwise, the right would be no stronger than the timidity or nervousness or impatience of the particular employer, in which case it would be effectively no right.
 
 
 12
 In addition to these substantive complexities of public employee speech doctrine, there are significant procedural complexities in litigating claims invoking the doctrine. These arise from the hybrid law/fact nature of the constitutional right at issue, and from the way in which the burdens of proof upon the essential elements of a claim of violation are cast in litigation.
 
 
 13
 As the Supreme Court has explained, the ultimate issues of whether particular speech is upon a "matter of legitimate public concern," and of whether, if so, it may yet be unprotected because, on balance, public employer interest outweighs the employee's first amendment interests, are both issues of constitutional law for the courts. Connick, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7 ("public concern" issue); id. at 150 n. 10, 103 S.Ct. at 1692 n. 10 (balancing issue). But, as is often the case in constitutional litigation, these ultimate issues of constitutional law inevitably embrace subsidiary issues of pure historical fact which establish the context in which "public concern" and the appropriate balance of competing interests must be legally assessed in particular cases. Cf., e.g., Miller v. Fenton, 474 U.S. 104, 116-17, 106 S.Ct. 445, 453-54, 88 L.Ed.2d 405 (1985) (whether confession was "voluntary"). Indeed, the factual context--the content, time, physical setting, and tone of particular speech, and the exact nature of the public employer's public function and obligations--is critical to resolution of the ultimate issues of constitutional law. See Connick, 461 U.S. at 150-54, 103 S.Ct. at 1691-94 (appropriate balancing factors outlined); see also Jones v. Dodson, 727 F.2d 1329, 1337-40 (4th Cir.1984) (importance of adequate factual development emphasized). Finally, the burden of proof upon these critical elements is differently allocated. The burden to establish that the speech in issue was upon a matter of legitimate public concern is upon the employee[2] but if this burden is carried, the burden to establish that public employer interests outweigh the employee's first amendment interest is upon the public employer. See Connick, 461 U.S. at 150, 103 S.Ct. at 1691 (burden is upon public employer, but varies in degree "depending upon the nature of the employee's expression").
 
 
 14
 We have summarized these substantive and procedural complexities to emphasize the special litigation problems they present for resolving this particular constitutional claim. These complexities are of course heightened when resolution is sought by summary judgment. Constitutional cases in general pose special problems for the summary judgment procedure, particularly where the ultimate constitutional issues require carefully developed factual predicates for fair resolution. See generally 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d Sec. 2732.2 (1983). In addition to the technical difficulties of establishing a sufficient base of undisputed fact on which to ground the ultimate constitutional decision, there is the special concern that such decisions should have the added assurance of proper factual support that a fully developed evidentiary record provides. See id. at 340-41. This does not of course mean that summary judgment is never, or even only rarely, appropriate to resolve constitutional cases or issues. Of course it may be. See id. at 363-65.
 
 
 15
 In this case, however, we are satisfied that all the difficulties above summarized have come together to make the entry of summary judgment improper on the present record. Specifically, we think that the district court simply erred as a matter of law in its threshold assessment of the "public concern" quality of Jackson's speech. Furthermore, we believe that beyond this, the summary judgment materials did not provide a sufficiently developed base of undisputed fact to permit the kind of careful "particularized balancing" of competing interests that is required in these cases.
 
 III
 
 16
 Because remand for further proceedings is therefore required, some discussion of our reasons is appropriate to guide those proceedings. We take the two points in order.
 
 
 17
 In a relatively brief decision delivered orally,[3] the district court's discussion suggests doubt that Jackson's speech was upon a matter of public concern, concluding that "even if Jackson's comments concerned matters of public interest in a limited way" the balancing test favored the state's interest. We disagree with this assessment of the speech in issue.
 
 
 18
 While, as indicated earlier, the exact content of Jackson's speech is disputed, there is no dispute about its substance. Jackson himself conceded that he expressed the opinion that Bair's policies were too lenient toward inmates and that if continued they would lead to a disturbance.
 
 
 19
 The district court's assessment that "even if" this speech was upon a matter of legitimate public concern, it was so only "in a limited way," is legally erroneous. The internal security of state prisons and the official policies that bear upon the maintenance of their security are obviously matters of fundamental and rightful public concern.
 
 
 20
 The district court's basis for assigning a lesser value to the speech, and that only arguendo, is not perfectly clear from its oral ruling from the bench. From its comments, it appears that the court may have been impressed with the nonpublic setting of the speech: that it was within the prison and was directed only to a number of fellow employees, rather than in a more public forum and to a wider outside audience. If this was the court's view, it misapprehended the controlling legal principles. Context may be important to the "public concern" inquiry, see Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690-91, but the fact that speech is directed only to a limited audience of fellow employees, or even to a single superior, does not prevent its being upon a matter of public concern in the critical sense here at issue. See Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (complaint privately communicated to superior); Connick (questionnaire circulated to fellow employees). Form and context may of course in some cases give special color to speech, tipping it one way or the other on the public concern-private grievance spectrum. See, e.g., Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1079-80 (4th Cir.1987). But content, subject-matter, is always the central aspect. Here, as indicated, the subject matter of Jackson's speech, prison security, is obviously on a core matter of legitimate public concern, and nothing in the context or form of its utterance deprived it of that intrinsic quality. On no rational basis could it have been considered simply the expression of purely private concerns about private circumstances.
 
 
 21
 The district court may also have been under an even more basic but related misapprehension about the nature of the public concern inquiry. The court observed that Jackson's comments "did nothing, it seems to me, to further the public concern." In this the court seems to have understood that only public employee speech which somehow effectively advances or relieves the public concern to which it is addressed is protected. The court's further observations suggest that it found this quality lacking here precisely because of the confined "setting" in which Jackson voiced his opinion. That, of course, is not a requirement for finding public employee speech protected: it need only be upon a matter of public concern; its practical effectiveness in addressing the concern is irrelevant. Even the most fatuous and ineffectual rhetoric may meet this threshold requirement. See Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (expression of hope that President would be killed).
 
 
 22
 As indicated, we can only surmise that these provided the basis for the district court's conclusion on the "public concern" question. They are the nearest indications we have from the oral opinion. In any event, however the conclusion was derived, we hold, reviewing the matter independently, see Rankin, 107 S.Ct. at 2897 & nn. 8, 9, that it was erroneous as a matter of law. We hold instead that on the undisputed facts on the summary judgment record, Jackson's speech was directly upon a matter of grave public concern, entitled by its content to commensurate weight in the balancing of interests.
 
 
 23
 The district court's downgrading of Jackson's first amendment right by erroneously assigning his speech only a limited "public concern" value obviously carried over into its balancing inquiry. That inquiry was thus tainted from the outset by this threshold legal error. Furthermore, critical facts concerning the extent of the actual threat posed by Jackson's speech to legitimate public employer interests are sufficiently disputed or undeveloped on the summary judgment record that the district court could not properly balance the conflicting interests no matter what weight it assigned the value of Jackson's speech.
 
 
 24
 District courts considering summary judgment motions are of course permitted, and indeed encouraged, to state for the record the "facts" they consider to be undisputed, hence proper factual predicates for entering judgment as a matter of law. See generally 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d Sec. 2716 (1983). Here the court recorded no hard facts that it considered established on the record and that demonstrated the existence of a real threat to or actual disruption of the public employer's interests other than the speech itself and Bair's apparent perception of such a threat. It may be assumed that the court did not make such "findings" because those facts had not been sufficiently developed or were sufficiently disputed on the summary judgment record that it could not do so. Instead the court simply assumed from the contents and setting of Jackson's speech and from the defendant's reactions that the comments necessarily posed so imminent and real a threat to legitimate employer interests that the public employer was justified in taking the immediate action now challenged. Thus, the court opined without other factual basis than the speech and official reaction to it that the "speech had the potential, clear and present, to impede the employee's abilities to perform his duties, which in turn impacted or impacts on other employees and ultimately endangered the total mission of the Corrections Department at [the] institution." Further, the court observed that
 
 
 25
 speech such as that uttered in this case certainly had the potential to damage a fellow prison guard's faith in the plaintiff's ability to continue to do his job. Also, it could possibly damage a fellow prison guard's faith in the larger controls of the prison system.
 
 
 26
 * * *
 
 
 27
 We find the possibility of morale problems; we find the possibility of tension being created between guards and fellow guards; we find the possibility of additional tensions being brought about between guards and inmates.... [I ]f the inmates heard the comment or if they got word of the comment, there is of course a clear danger, it appears to the Court, that Mr. Jackson's prophesy [sic] of a riot or some kind of disturbance would possibly become self-fulfilling.
 
 
 28
 Joint Appendix pp. 23-24 (emphasis supplied).
 
 
 29
 All of these possibilities and potentialities and hypotheses posed by the district court could of course turn out to be the truth of the matter, and if such a threat to employer interests actually existed, or even if it could reasonably have been apprehended by Bair and his superiors whether or not it actually existed, it might properly have tipped the balance against Jackson's speech right. But the summary judgment record simply would not support a factual determination that any such threat had actually materialized or even that it was imminent, nor that Bair had any reasonable basis for apprehending either when he acted.
 
 
 30
 So far as the record indisputably shows, Bair acted on no more information about the actual or threatened impact of Jackson's speech than the conflicting versions given him by Jackson and Williams. Nor did the summary judgment record reveal more for judicial assessment. Those conflicts bore critically upon the likelihood that any real threat existed. Depending upon the context, including the reactions of the immediate audience, Jackson's comments may have been treated by his fellows as nothing more than the routine grousing that occurs in varying degrees in any workplace. Depending upon their view of Jackson and his general proclivities, they may have discounted it utterly or been as shaken by it as the district judge hypothesized. Some of them indicated on the record that it made no particular impression upon them. In any event, those persons' immediate perceptions and reactions seem critical to a fair assessment of the balancing issue.
 
 
 31
 The district court rightly considered that employment in the prison context presents special considerations favoring the public employer in the balancing process. And as we have pointed out, a public employer need not await actual disruption before acting to discipline an employee whose speech threatens legitimate employer interests in the efficient discharge of public duties. But when the employer acts on mere potential for disruption, there must be an objectively justifiable basis for his apprehension of the threat. On the summary judgment record here, the balance could be tipped in favor of public employer interests only if statements such as Jackson's are per se unprotected in the prison security environment, without regard to their actual potential for injury to employer interests. We decline to adopt such a rule.
 
 IV
 
 32
 We affirm the grant of summary judgment in favor of defendant Sielaff for reasons stated by the district court. But for the above reasons we will vacate the grant of summary judgment in favor of all the other defendants on Jackson's first amendment claim and remand for further proceedings consistent with this opinion. Unless the district court considers that in the interests of justice the summary judgment record should be reopened for reconsideration on an expanded record, the case must go to trial on the unresolved issues of causation and whether on balance Jackson's speech is protected, this court having determined that it was upon a matter of public concern.
 
 
 33
 We observe in this connection that the defendants have raised the defense of qualified immunity, which has yet to be addressed, and should of course be considered before going to trial on the merits. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
 
 
 34
 AFFIRMED IN PART; AND REVERSED IN PART.
 
 WIDENER, Circuit Judge, dissenting:
 
 35
 I believe the record in this case supports the grant of summary judgment for defendants, and that the Virginia Department of Corrections acted permissibly in first suspending and then in transferring Jackson. Accordingly, I respectfully dissent.
 
 
 36
 In First Amendment cases, we have an obligation to conduct an independent examination of the whole record to make sure there is no forbidden intrusion on the field of free expression. Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 2897 n. 9, 97 L.Ed.2d 315 (1987), reh'g denied --- U.S. ----, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987). In reviewing this grant of summary judgment, consideration is limited to facts which are undisputed, viewing them in a light most favorable to Jackson.
 
 
 37
 Mecklenburg Correctional Center is a maximum security institution. It houses death row inmates, maximum security inmates, and in addition the most disruptive and trouble-making inmates of the prison system, as well as some inmates in protective custody. Maximum security inmates are those with sentences of 50 years or more, and even those are described by Jackson as the "lesser of two evils."In the months preceding Jackson's transfer, Mecklenburg had experienced several crises, and at least one change of administration. The "[s]taff was extremely demoralized" and the department administration was "in the midst of trying to rebuild the confidence in the people who worked there and to reestablish good security practices and operations." On May 31, 1984, several death row inmates escaped. In July of that year, there was a riot.[1] In August 1984, inmates staged an uprising, taking hostages who were held for 19 hours. Jackson acknowledged that during the summer of 1984, Mecklenburg was a "stressful situation to work in"; the inmates were violent toward property or people and there were frequent assaults. Against this backdrop of volatility, Mecklenburg experienced interim administrations from the summer of 1984 until Toni Bair was appointed Warden on January 16, 1985. In the three weeks that elapsed between the time Bair assumed the position of warden and the incident under inquiry here which occasioned Jackson's suspension and transfer, Jackson had already voiced to Bair criticism of certain of Bair's actions in connection with the way Bair handled a confrontation between Jackson and an inmate.
 
 
 38
 Remarkably, this factual setting, as well as certain other facts which will appear in this dissent, is not taken account of by the majority, but I cannot divorce it from the case at hand.
 
 
 39
 Jackson was in charge of the Prison Emergency Response Team (PERT) then in existence at Mecklenburg. The PERT team, whose responsibilities are related in the majority opinion, was comprised of two squads, a total of twelve men, who in turn were charged with responding to prison emergencies.
 
 
 40
 On February 6, 1985, Jackson uttered the remarks that spawned this controversy. I take no issue with the majority's recitation of the undisputed portions of Jackson's remarks in the staff cafeteria. But, I would add that it is also undisputed that when Martha Williams heard Jackson's criticism of Bair's policies, it disturbed her so much that she went to the assistant warden and related the remarks to him. She was "concerned about my own security;" to Miss Williams, "... that's [referring to Jackson] a very serious statement, and I think it can jeopardize the security of an institution." Later that afternoon, Miss Williams was summoned to Warden Bair's office where she repeated to Bair the conversation she had heard in the lunchroom. She told both Bair and the assistant warden that the remarks were made in the presence of inmates, and they had obviously been made in the presence of the staff members at the table. Before taking any action with respect to Jackson, Warden Bair consulted with his superiors in Richmond, was first advised to place Jackson on suspension pending an investigation of the incident, and later that same day was advised to transfer Jackson. Bair requested a meeting with Jackson, and in that meeting Jackson admitted to having criticized the warden's policies and predicting that a riot would occur due to those allegedly lenient policies. Jackson was initially suspended pending further investigation and was escorted from the prison. About an hour and a half later, the suspension was lifted and he was ordered transferred to Nottoway Correctional Center. Later that same day, the order of transfer was amended, and he was directed to report to the Virginia State Penitentiary the following day, February 7th. Jackson refused to report as ordered. Rather than reporting to his new post, he traveled to Richmond, seeking and obtaining ad hoc meetings with department officials, including Director Sielaff. Jackson sought rescission of the transfer and reinstatement to his position at Mecklenburg. This request was denied and he was directed to report for duty at the penitentiary. Jackson persisted in his refusal to report to his new duty assignment, and, on or about February 11th, he filed a grievance protesting the transfer, claiming it was punitive and in violation of the First Amendment. On February 25th, Fred Jordan, then the Department's Regional Administrator, wrote Jackson informing him that the department's investigation indicated that Jackson had not acted inappropriately but that it would be in the best interests of all concerned that he be transferred to Nottoway, effective March 1st. Jackson also refused this lateral transfer, and, on March 5th, Jordan wrote Jackson informing him that he was being placed on five day suspension for "[f]ailure to follow supervisor's instructions, perform assigned work or otherwise comply with established written policy". The March 5th letter advised Jackson that he would be terminated if he failed to report for duty at Nottoway on March 9th. Jackson failed to report and on March 14th Jackson was notified that he was being terminated effective March 9th. The grievance process ultimately resulted in a three-member panel deciding that Jackson be reinstated at Mecklenburg. The panel also found that the transfers were "disciplinary and grievable". Jackson was reinstated at the same rank and pay he had previously earned, although the department refused to reassign him as head of the PERT team. Jackson made it clear that he believed the department had an obligation to reinstate him as head of the PERT team at Mecklenburg and that any other assignment, irrespective of pay scale and rank, was unacceptable. Jackson testified that because of the department's refusal to comply with his demand to be reassigned as head of the PERT team at Mecklenburg, he resigned. He filed the underlying complaint in the United States District Court for the Eastern District of Virginia on September 25, 1986.
 
 
 41
 In granting summary judgment to defendants, the district judge articulated findings of fact and conclusions of law, which the majority criticizes as, among other things, unsupported by the summary judgment record. Slip op. at 18.[2] The district court determined that the "place and manner and nature in which [Jackson] chose to exercise his speech in this case ... does not merit protection under these circumstances."
 
 
 42
 I believe the district court's findings of fact are supported by the record. As set forth above, Mecklenburg was in turmoil. As a direct result of the serious problems experienced at the institution, staff morale was low, "things were at an all time low. They could not have gotten any lower." Thus, the actual existence of the potential for another serious disturbance is not disputed.[3] Jackson has offered nothing contradicting the characterization of daily life at Mecklenburg as volatile. Indeed, he testified at length about that very matter.
 
 
 43
 In this case, those charged with administering a maximum security prison, housing among the worst behaved inmates incarcerated in the state prison system, were presented with information that the officer in charge of the emergency response team, responsible for quelling disturbances, was openly hostile to the policies being implemented by the newly appointed warden of the institution at a time when the staff was demoralized and things were at an all time low. Acting on that information, they first ordered Jackson suspended, which lasted something more than an hour, and then ordered him transferred to another environment, in a different institution. It is difficult for me to perceive a set of facts which better support a finding of fact that, at the time of the action undertaken as a result of the speech, there existed a potential for adverse impact upon discipline and morale as well as the possibility of disharmony and ultimate impairment of the efficiency of the agency. See Connick v. Myers, 461 U.S. 138, 151, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Justice Powell concurring). See also Jurgensen v. Fairfax County, Va., 745 F.2d 868, 879 (4th Cir.1984) ("it is sufficient that [damage] to morale and efficiency is reasonably to be apprehended").
 
 
 44
 The requisite elements for consideration of a first amendment claim in the context of public employment are whether the speech is related to a matter of public concern, and hence protected, and whether the employer's reaction to protected speech promotes the governmental interest in maintaining discipline and promoting efficiency and integrity in the discharge of official duties. Jurgensen, supra at 880.[4] Even assuming, for purposes of summary judgment, that the subject matter of Jackson's speech was a matter of public concern, I fail to see how he survives the application of the second prong of the analysis.[5] Discerning a lack of undisputed or sufficiently developed facts capable of sustaining a finding that there was an "actual" threat posed by Jackson's speech, the majority decides that the "district court could not properly balance the conflicting interests". Maj. op. at 721. The factual context is critical to the resolution of the constitutional issue. At 718. Based upon its review of this record, the majority fails to find the existence of a real threat to, or actual disruption of, the employer's interests, "other than Bair's apparent perception of such a threat". The majority further believes that the district court impermissibly assumed the existence of a threat from the content of the speech and official reaction thereto. With all respect, I suggest the district judge has the better of it. The majority's reading of the record ignores the background of riot and turmoil and improperly minimizes much of the factual setting of the speech for which protection is sought. While the majority acknowledges that there are special considerations favoring this public employer, maj. op. at 722, it never mentions the fact that Mecklenburg was a severely troubled maximum security correctional facility. Similarly, it fails to recognize Jackson's disagreement with department policy that is not disputed in the record.
 
 
 45
 The majority is of course correct in noting the complex nature of the issue as well as the difficulty in applying the "public concern" and "interest balancing" elements required by relevant case law. Maj. op. at 717. And, it is important to note that it has been recognized that in undertaking a balancing test, courts must[6]
 
 
 46
 give weight to the nature of the employee's job in assessing the possible effect of his action on employee morale, discipline or efficiency. In so doing, it must be recognized that such effect may vary with the job occupied by the employee. In analyzing the weight to be given a particular job in this connection non-policymaking employees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored.... In polar contrast is the discipline demanded of, and freedom correspondingly denied to policemen.
 
 
 47
 Jurgensen, supra at 880 (citations omitted).
 
 
 48
 We are also cautioned to avoid creating constitutional issues out of every public employment decision. Connick, supra at 143, 103 S.Ct. at 1688; see also Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir.1986). Indeed, Connick instructed against placing an unduly onerous burden on the State to justify its action, stating that the burden to be met by the State "varies depending upon the nature of the employee's expression". Connick at 149-50, 103 S.Ct. at 1692. In light of the Supreme Court's instructions to consider the nature of the employee's expression in balancing protected speech against the public employer's interests, it was not error for the district court to conclude, as it did, that Jackson's comments, "even if [they] concerned matters of public interest in a limited way" were outweighed by the interests of the State. Even if the public interest was more than limited, as the majority apparently holds, it is apparent that the interests of the State outweigh whatever public interest there may be, and rather than being a threshold legal error tainting the judgment, maj. op. at 719, this determination appears to be consistent with First Amendment decisions in this circuit and of the Supreme Court.
 
 
 49
 Another factor in the equation is whether close working relationships are essential to fulfilling the public employer's public responsibilities. If they are, "a wide degree of deference to the employer's judgment is appropriate". Connick at 151-52, 103 S.Ct. at 1692. We have previously noted that when circumstances concern a supervisor within a para-military unit, as here, "mutual confidence and loyalty are of great importance". Joyner, supra at 24. It follows that we owe a wide degree of deference to the department's judgment first to suspend and then to transfer Jackson. No reason is shown in the record not to defer to the prison authorities in this case.
 
 
 50
 But my most pronounced disagreement with the majority is on account of the following.
 
 The Supreme Court has stated that:
 
 51
 we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office is manifest before taking action.
 
 
 52
 Connick at 152, 103 S.Ct. at 1692 (emphasis added).
 
 
 53
 The majority today decides that a public employer may not permissibly act to discipline an employee for commenting upon matters of public concern unless the employer can establish an "objectively justifiable basis for his apprehension of a threat." Maj. op. at 722. "Acting on mere potential for disruption" is not enough. Id. Thus, the only conclusion to be logically drawn from the majority opinion is that the department had a duty to gather evidence which tended to show probable disruption or harm before it acted. This is evident in the emphasis placed upon actual perceptions and suggested reactions of co-workers. Maj. op. at 722. This standard, however, I suggest, is nowhere reflected in the case law. In fact, we have repeatedly stated that it is the potential for harm that allows the public employer to act. Jurgensen v. Fairfax County Va., supra at 879 ("[i]f the perception of potential harm or damage is present, that fact may outweigh any First Amendment rights involved"); Jones v. Dodson, 727 F.2d 1329, 1334 (4th Cir.1984), (court must weigh "the degree of 'public concern' " against "the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations"). See also Connick, supra at 152, 103 S.Ct. at 1692. Whether or not a public employer is justified in perceiving a threat is a very different standard from requiring that the employer prove the existence of an objectively justifiable basis for such a perception. Thus, the majority would unfortunately misconstrue Connick, but nothing in the cases, I think, requires a public employer to meet such a standard. Indeed, I discern no real difference between the standard adopted by the majority today and that already rejected in Connick (it is error to require the public employer to "clearly demonstrate" that the speech "substantially interfered" with official responsibilities"). Connick at 150, 103 S.Ct. at 1691.
 
 
 54
 Jackson's comments were not uttered in a vacuum. Rather, they represented a dispute between a subordinate and his superior officer over how to best manage this maximum security prison in a very troubled and delicate situation. The remarks were not directed in private to a sole co-worker, but were made in a busy cafeteria to several people, and not only to colleagues, Bair was advised. Whether or not Jackson said he would sit back and watch the predicted riot, or whether he spoke in a loud manner, are issues which need not be decided to conclude, as a matter of law based upon the application of the undisputed facts in this record, that there existed the threat of disruption or harm entitling the public employer to suspend and then transfer Jackson. I believe the record amply supports the finding that the department perceived a legitimate threat to the safe operation of Mecklenburg. In this case, I think the balance was properly struck by the district court in favor of the public employer. Accordingly, I would affirm the grant of summary judgment.
 
 
 
 [1]
 Because the dispositive issue on this appeal is the propriety of granting summary judgment, we draw this recitation of facts from the summary judgment materials before the district court. Where there is dispute as to possibly material fact, we have indicated it; otherwise the facts recited are undisputed on the record
 
 
 [2]
 Along with the burden to prove that the employer's conduct was based at least in part upon the employee's speech, at which point the defendant may attempt to prove in avoidance that the action would have been taken in any event for other reasons. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576
 
 
 [3]
 The court's discussion of the first amendment claim was as follows:
 Now we come to another issue regarding free speech. Are the defendants entitled to summary judgment on Count One because Jackson's free speech rights have not really been violated? This is the question we have before the Court.
 Now, in order for a public employee to maintain an action for alleged adverse action in violation of his First Amendment rights, the plaintiff must show that the speech complained of qualified as protected speech. And two, that such speech, protected speech, was the motivating factor, the "but for" cause for his discharge on the motion. If the speech cannot fairly be characterized as speech on a matter of public concern, then the plaintiff fails. Of course, the First Amendment guarantee is not absolute. I think that's clear. That is, there are occasions when this right must yield to some higher interest. This is acutely so in the arena of public employment. And here, where we are dealing with prison environment, the analysis must be even more careful and sensitive in assessing any alleged paramount State interest.
 The Supreme Court in Pickering v. Board of Education establishes a test for us to apply in determining whether a public employee's speech qualified for constitutional protection. They suggested balancing the interest of the public employee as a citizen in commenting on matters of public concern on the one hand; and on the other, the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees.
 Let's then apply the facts of this case, accepting only those facts which the plaintiff admits. First of all, in a maximum security prison environment, the State certainly has a great need for harmony in the workplace. The prison environment required prison guards to have a close and trusting relationship with their co-workers. And speech such as that uttered in this case certainly had the potential to damage a fellow prison guard's faith in the plaintiff's ability to continue to do his job. Also, it could possibly damage a fellow prison guard's faith in the larger controls of the prison system. Something, again, that it seems to me would be crucial for the smooth running of a prison.
 Now, the time, manner, and place of the speech has to be considered. That is, inside the prison; in a busy, populated dining facility; in the presence of other Corrections Department employees. It seems to this Court that was again certainly inappropriate and further reason to fear the negative consequences I previously mentioned.
 Further, such comments in this kind of setting did nothing, it seems to me, to further the public concern. The speech also had the potential, clear and present, to impede the employee's ability to perform his duties, which in turn impacted or impacts on other employees and ultimately endangered the total mission of the Corrections Department at that institution.
 I find that even if Jackson's comments concerned matters of public interest in a limited way, the application of this balancing test favors the State interest over the plaintiff's asserted First Amendment rights.
 We look at the problem-causing potential of plaintiff's statements regarding his own views of Warden Bair's policies and leadership abilities, and we find the following: We find the possibility of morale problems; we find the possibility of tension being between guards and inmates. And if inmates were to either hear the comment, which was a possibility--although Mr. Jackson doesn't admit to the people being in close proximity, it was possible--if the inmates heard the comment or if they got word of the comment, there is of course a clear danger, it appears to the Court, that Mr. Jackson's prophesy [sic] of a riot or some kind of disturbance would possibly become self-fulfilling.
 Mr. Jackson could have brought his complaints to the proper authorities in the Corrections Department. He could have gone outside of the chain of command to his elected representative, or even the media. Or he could have carried on this conversation in another setting designed to seek remedies for the failures that he saw. But the place and manner and nature in which he chose to exercise his speech in this case, in this Court's opinion, does not merit protection under these circumstances.
 Therefore, defendant's motion for summary judgment on Count One is hereby granted.
 J.A. pp. 21-24.
 
 
 [1]
 Officer Jackson described the July riot:
 A. Basically, we had officers suited in riot gear. Inmates had taken equipment off the recreation yard and broken it up into weapons, and we went into the rec yard and had to physically subdue the inmates, take the weapons away from them and put them back in the buildings. Building 1 was first to do it. They took the yard over. Then as we took Building 1 yard back, the two officers that were stationed on Building 2 recreation yard were attacked by a group of inmates in the recreation yard, then we responded and took that yard back.
 Q. Both of these yards had to be taken back by force?
 A. Yes.
 Q. Inmates just didn't give up?
 A. No, sir.
 Q. Did they fight you?
 A. Yes.
 Q. Did you physically fight with any inmates?
 A. Yes.
 * * *
 Q. Any officers injured seriously?
 A. Yes. Several of us were injured.
 
 
 [2]
 The district judge found, considering only those facts admitted by Jackson, that Jackson's remarks were uttered in a maximum security prison environment, which "required prison guards to have a close and trusting relationship with their co-workers"; and that the comments were made in a "busy, populated dining facility, in the presence of other Corrections Department employees". Based upon these facts as to time, place and manner of the speech, the district court concluded that 1) in a maximum security prison environment, the State has "great need for harmony in the workplace"; 2) Jackson's remarks "had the potential to damage a fellow prison guard's faith in the plaintiff's ability to continue to do his job" and to further damage co-workers' faith in the larger controls of the prison system; 3) the speech had the clear and present potential "to impede [Jackson's] ability to perform his duties, which in turn [impacts] on other employees and ultimately endangered the total mission of the Corrections Department at that institution."
 The district judge explicitly considered the potential for harm or damage attributable to Jackson's remarks, and found extant the "possibility of morale problems; ... the possibility of tension being created between guards and inmates". The district court also determined that whether the inmates heard Jackson utter the comment (which he denies), "or if they got word" of it, there was a clear danger ... that Mr. Jackson's prophesy of a riot or some kind of disturbance would possibly become self-fulfilling."
 
 
 [3]
 The majority maintains that whether Jackson's remarks would have caused disruption is undeveloped on the record. I maintain the potential for harm or disruption attributable to the comments is established by this record. What is not subject to interpretation is that at the time the comments were made, the atmosphere at Mecklenburg remained tense, capable of exploding at any misstep
 
 
 [4]
 It is undisputed that Jackson was transferred as a direct result of his remarks. Hence we need not engage in the "but for" analysis established by Mt. Healthy City School Bd. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)
 I also note here that Jackson received all the procedural due process to which he was entitled, so the only question is, was the 1 1/2 hour suspension and transfer justified under the facts of this case in the face of the First Amendment claim.
 
 
 [5]
 While I am not convinced that Jackson's speech is protected, I need not engage in this analysis since I believe that the employer's interests in maintaining harmony and discipline within a maximum security correctional facility which was already in turmoil and housed among the State's most disruptive inmates outweighs any such protection
 
 
 [6]
 As we noted in Joyner v. Lancaster, 815 F.2d 20, 23 (4th Cir.1987), cert. denied --- U.S. ----, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987), "[these] kinds of variables have been noted by other courts". (citations omitted)