MURNAGHAN, Circuit Judge,
dissenting:
The majority’s interpretation of the “public concern” doctrine makes the role of the speaker dispositive of the analysis. Specifically, the majority states that “critical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is ‘made primarily in the [employee’s] role as citizen or primarily in his role as employee.’ ” See ante at 407 (quoting Terrell v. University of Tex. Sys. Police, 792 F.2d 1360, 1362 (5th Cir.1986)). The majority then rejects the plaintiffs’ First Amendment claim because “[t]he speech at issue here ... is clearly made in the employee’s role as employee.”' Id. at 408. Because an analysis of Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and its progeny reveals that the majority has adopted an unduly restrictive interpretation of the “public concern” doctrine, I respectfully dissent.
I.
A.
In Connick, the Supreme Court held that, as a threshold matter, if ■ a public employee’s speech “cannot be fairly characterized as constituting speech on a matter of public concern,” then a court does not balance the employer’s interests with those of the employee. Connick, 461 U.S. at 146, 103 S.Ct. 1684. The Court broadly defined speech of public concern as speech “relating to any matter of political, social, or other concern to the community.”- Id. The Court also stated that,“[w]hether an *436 employee’s speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.” Id. at 147-48, 103 S.Ct. 1684. Nowhere in Connick, however, did the Court state that the role of the speaker, standing alone, would be dispositive of the public concern analysis.
Indeed, the facts of Connick belie this suggestion. Sheila Myers, an Assistant District Attorney, was discharged for distributing a questionnaire to the other attorneys in her office. In general, Myers’ questionnaire asked her peers what they thought of the trustworthiness of certain attorneys in the office, the morale of the office, and the office’s transfer policy. See id. at 141, 103 S.Ct. 1684.
The Court held that these questions “do not fall under the rubric of matters of ‘public concern,’ ” because they were “mere extensions of Myers’ dispute over her transfer to another section of the criminal court.” Id. at 148, 103 S.Ct. 1684. Myers’ questionnaire, however, also asked whether her fellow attorneys “ever feel pressured to work in political campaigns on behalf of office supported candidates.” Id. at 149, 103 S.Ct. 1684. This question was in the same form and context as Myers’ other questions — an internal questionnaire distributed by an employee complaining about on-the-job conditions. The question thus was speech by an employee in her role as an employee. The Court nevertheless held that this question did “touch upon a matter of public concern.” Id. The majority’s formalistic focus on the “role of the speaker” in employee speech cases therefore runs directly contrary to Supreme Court precedent.
B.
Post-Connick decisions of this court also make it clear that the role of the speaker does not control the public concern analysis. In Piver v. Pender County Bd. of Educ., 835 F.2d 1076 (4th Cir.1987), the plaintiff, a high school teacher, circulated a petition to his students during class urging retention of the school’s principal. See id. at 1077. The plaintiff undoubtedly was speaking in his role as an employee, as he was being paid by the State and using State facilities (classrooms) to carry out his employment duties (instructing students). The court nevertheless held that the plaintiffs speech was on a matter of public concern because it was a “matter in which the community ... was vitally interested.” Id. at 1080. The court also stressed that the speech was “of much wider importance than a mere ‘private personnel grievance,’ ” that would not be of public concern. Id.
In Piver, the court relied on the “public concern” analysis set out by this court in Berger v. Battaglia, 779 F.2d 992 (4th Cir.1985). In Berger, the court interpreted the public concern doctrine as excluding from First Amendment protection only those matters of purely personal interest to the employee.
Pickering, its antecedents, and its progeny — particularly Connick — make it plain that the “public concern” or “community interest” inquiry is better designed — and more concerned — to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is. The principle that emerges is that all public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely “personal concern” to the employee — most typically, a private personnel grievance.
Id. at 998. Furthermore, the court stated that when analyzing whether speech is upon “any matter of political, social, or other concern to the community,” see Connick, 461 U.S. at 146, 103 S.Ct. 1684, “[t]he focus is ... upon whether the ‘public’ or the ‘community’ is likely to be truly con *437 cerned with or interested in the particular expression, or whether it is more properly viewed as essentially a ‘private’ matter between employer and employee.” Berger, 779 F.2d at 999.
Berger’s broad approach to the public concern doctrine, focusing on the public importance of the speech, stands in stark contrast to the majority’s singular focus on the role of the speaker — regardless of the public import of the speaker’s message. See also Arvinger v. Mayor and City Council of Baltimore, 862 F.2d 75, 79 (4th Cir.1988) (“Although the Connick court did not elaborate on the relative weight to be accorded these three factors, this court has held that ‘content, subject-matter, is always the central aspect.’ ”) (quoting Jackson v. Bair, 851 F.2d 714, 720 (4th Cir.1988)).
C.
The majority justifies its singular focus on the role of the speaker by citing to language from United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (“NTEU”). In NTEU, the plaintiffs were executive branch employees challenging a law prohibiting federal employees from accepting any compensation for making speeches or writing articles, even when the speeches or articles did not have any connection to the employees’ official duties. The Supreme Court held that the plaintiffs’ speech was on a matter of public concern. See id. at 466, 115 S.Ct. 1003. In doing so, the Court stated that “[t]hey seek compensation for their expressive activities in their capacity as citizens, not as Government employees..... With few exceptions, the content of respondents’ messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work.” Id. at 465, 115 S.Ct. 1003.
The majority’s analysis of this language attempts to push NTEU where it did not go. The Court in NTEU stated that the plaintiffs’ speech was on a matter of public concern in part because it was unrelated to the plaintiffs’ employment; however, nowhere in NTEU did the Court state the converse: namely, that if the plaintiffs’ speech was in their role as employees, then it automatically would not qualify as speech on a matter of public concern. Therefore, at best, NTEU suggests that the role of the speaker is a factor in a public concern analysis. But even a broad reading of NTEU does not suggest that the role of the speaker is the only factor to consider in a public concern analysis, despite the majority’s claims to the contrary.
The majority also relies on our decision in Boring v. Buncombe County Bd. of Educ., 136 F.3d 364 (4th Cir.1998) (en banc). In Boring, the plaintiff, a high school teacher, was transferred by her principal for producing a student-acted play that addressed controversial topics such as lesbianism and teen pregnancy. The plaintiff alleged that the County violated her First Amendment rights by transferring her in retaliation for producing the play. See id. at 366-67.
A majority of this court framed the issue in Boring as only “whether a public high school teacher has a First Amendment right to participate in the makeup of the school curriculum through the selection and production of a play.” Id. at 366. The majority held that the plaintiffs selection of the play was not a matter of public concern and was merely an “ordinary employment dispute.” Id. at 368. As their framing of the issue shows, however, the majority’s reasoning was not based on the fact that the plaintiffs production of the play was in her role as a school district employee. Rather, the majority answered the narrower question of whether a teacher has a First Amendment right to participate in the makeup of the curriculum.
Judge Luttig’s concurring opinion in Boring also illustrates that the majority’s holding did not deal with the broader issue of whether speech by an employee in her *438 role as an employee can qualify as speech on a matter of public concern. Judge Lut-tig stated that
[the dissent] fails to recognize the elementary difference between teacher in-class speech which is curricular, and teacher in-class speech which is noncur-ricular, because it assumes that every word uttered by a teacher in a classroom is curriculum. In the latter context of teacher in-class noncumcular speech, the teacher assuredly enjoys some 'First Amendment protection.
Id. at 373 (Luttig, J., concurring) (emphasis added). Presumably, Judge Luttig meant that teacher in-class noncumcular speech could be speech on a matter of public concern. As stated previously, however, a teacher’s in-class speech is speech in her role as an employee, whether the speech is curricular 'or noncumcular. While students are under her care and supervision in the classroom, a teacher surely cannot be regarded as a “citizen” rather than an “employee” merely because she is discussing something other than trigonometry. Thus, Boring must rest on something other than the principle that speech by an employee in her role as an employee never qualifies as speech on a matter of public concern. See Boring, 136 F.3d at 379 (Motz, J., dissenting) (“Because the majority does not attempt to explicitly hold that the role in which an employee speaks is determinative [or overrule prior precedent], this reasoning must not be the basis for its conclusion that Boring’s speech does not relate to a matter of public concern.”). Boring therefore does not compel a finding that the plaintiffs’ speech is not on a matter of public concern, merely because the plaintiffs’ speech occurs in their role as employees.[1]
D.
Because speech by an employee in her role as an employee can qualify as speech on a matter of public concern, the issue thus becomes whether, in the instant case, the plaintiffs’ speech is on a “matter of political, social, or other concern to the community.” Connick, 461 U.S. at 146, 103 S.Ct. 1684. The plaintiffs’ speech easily meets this test. The Supreme Court has stated that “[s]ex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." Roth v. United States, 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (emphasis added).
The Act restricts over 101,000 state employees, including university professors, librarians, museum workers, and physicians and social workers at state hospitals, from researching, discussing, and writing about sexually explicit material. As the district court noted, “the Act’s broad definition of ‘sexually explicit’ content would include research and debate on sexual themes in art, literature, history and the law, speech and research by medical and mental health professionals concerning sexual disease, sexual dysfunction, and sexually related mental disorders, and the routine exchange of information among social workers on sexual assault and child abuse.” Urofsky v. Allen, 995 F.Supp. 634, 636 (E.D.Va.1998). .These topics undeniably touch on matters of public concern.
The Commonwealth’s recent revision to the Act limiting the definition of “sexually explicit content” to materials and descriptions that are “lascivious” does not change the analysis. Many works of public import could be classified as lascivious; in fact, many were specifically intended to have such an effect. For instance, the works of Toni Morrison and many themes found in Victorian poetry, including the material researched online by one of the plaintiffs, *439 Professor Myers, could be classified as lascivious. Also, the application of the Act to “lascivious” e-mail discussions by psychologists and social workers implicates topics of public import, because the public has an interest in unfettered discussions by State professionals concerning the abnormal sexual behaviors of them patients, in order to better diagnose and understand sexual deviancy.
Finally, the form of the plaintiffs’ speech, Internet and e-mail communications, makes the speech of special public significance. In the information age, electronic communications may be the most important forum for accessing and discussing topics of concern to the community. This court should be wary of allowing the State to regulate this important medium of communication without requiring a legitimate justification for the regulation.
II.
Because the plaintiffs’ speech is on a matter of public concern, we must balance the plaintiffs’ interests in speaking on a matter of public concern against “the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Our analysis of this balancing test is guided by the Supreme Court’s decision in NTEU, a case involving a statutory prohibition on certain types of employee speech.
As in NTEU, the Act at issue in the instant case does not involve a post hoc analysis of one public employee’s speech and the impact of that speech on the operation of government. Rather, we are forced to apply Pickering to the Commonwealth’s “wholesale deterrent to a broad category of expression by a massive number of potential speakers.” NTEU, 513 U.S. at 467, 115 S.Ct. 1003. The widespread impact of a prospective deterrent on employee speech “gives rise to far more serious concerns than could any single supervisory decision,” because “unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens.” Id. at 468, 115 S.Ct. 1003.
The Commonwealth’s burden in justifying its statutory restrictions on speech is therefore greater than with respect to an isolated disciplinary action. The Commonwealth must establish that “the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression’s ‘necessary impact on the actual operation’ of the Government.” Id. (quoting Pickering, 391 U.S. at 571, 88 S.Ct. 1731).
A. The Interests of the Plaintiffs and the Public
The Act restricts 101,000 state employees from researching, discussing, and writing about sexually explicit topics within their areas of expertise, thereby depriving the plaintiffs of their ability to speak on matters of public concern. It is difficult to measure the effect that the Act will have in stifling commentary and discourse on important topics in art, literature, psychology, and other disciplines; however, it is possible, for example, that seminal academic commentary on the works of Toni Morrison might be scrapped, and that research into sadomasochistic abuse in prisons might be set aside. The chilling of discourse on these topics and other issues adversely affects the mate-rial available to “potential audiences” of the plaintiffs’ speech, restricting “the public’s right to read and hear what the employees would otherwise have written and said.” NTEU, 513 U.S. at 470, 115 S.Ct. 1003. The Act thereby deprives the public of the “unique insights” that public employees can provide in their areas of specialization. Sanjour v. Environmental Protection Agency, 56 F.3d 85, 94 (D.C.Cir.1995) (en banc).
B. The Commonwealth’s Interests
The Commonwealth advances two interests in support of the Act’s broad restric *440 tions on employee speech: (1) maintaining operational efficiency in the workplace; and (2) preventing a sexually hostile work environment. While the Act may marginally serve the Commonwealth’s asserted interests, the under and overinclusiveness of the Act is fatal to its constitutionality.
1. Underinclusiveness
The Commonwealth argues that the Act furthers its interest in workplace efficiency. The Commonwealth states that “[a] state employee who is reading sexually explicit material unrelated to his work is not doing the job he was hired to do.” Appellant’s Br. at 35. The Commonwealth’s general interest in workplace efficiency, however, cannot be the basis for the Act’s specific prohibition on accessing sexually explicit material on State computers.
First, employee efficiency is undermined by any activities that distract an employee from her job-related duties, not just unauthorized Internet use. Reading newspapers, listening to the radio, chatting with coworkers, or talking on the telephone with friends are examples of activities that keep an employee from performing her best on the job. The Commonwealth, however, does not attempt to regulate these activities through the Act, nor does it cite to any evidence that accessing sexually explicit material undermines workplace efficiency any more than these activities.
Second, the Act does not even cover all of the uses of the Internet that undermine workplace efficiency. Employees may use State computers to send non-work related e-mail, as well as access news services, chat rooms, sports websites, and other material unrelated to their jobs. The Commonwealth has not explained, and cannot possibly explain, why employees who access sexually explicit material are any less “efficient” at their work than employees who check espn.com every twenty minutes during the NCAA tournament.
The Commonwealth next argues that the Act furthers its interest in preventing sexual harassment in the workplace. Again, the Act is not tailored to combat this ill in any material way. The Act targets only access to sexually explicit material on the Internet — ignoring books, calendars, pictures, and other sexually explicit material that demeans women and helps create a sexually hostile work environment. A professor therefore would violate the Act by accessing the Internet to complete research on Victorian poetry, yet he would not violate the Act by leaving copies of Hustler Magazine lying around his office.
In addition, the Act only prohibits the accessing of sexually explicit material on state-owned, computers; it does not impose a general ban on accessing any sexually explicit material on computers in the workplace. Thus, a state employee may use his own computer to access patently pornographic pictures around his students or colleagues without violating the Act. The Commonwealth does not provide any justification for why sexually explicit images are any less likely to create a hostile work environment if those images come from an employee’s personal computer rather than from a-state-owned computer.
2. Overinclusiveness
The Act is also impermissibly overinclu-sive. It prohibits research and commentary by state employees who access this material to advance public discourse, awareness, treatment, and commentary on a variety of disciplines and social problems. The Act thus reaches the legitimate work-related uses of sexually explicit material, uses wholly unrelated to the narrower category of gratuitous sampling of pornographic material that the Act was intended to address. The Commonwealth appears to concede this point; however, the Commonwealth argues that the Act’s prior approval process ensures that employees who have a legitimate need to access sexual explicit material will be able to do so.
*441 The Act’s prior approval provision allows state employees to access sexually explicit material “to the extent required in conjunction with a bona fide, agency-approved research project or other agency-approved undertaking.” The Act’s prior approval process, however, has no check on the discretionary authority of State agencies. The Supreme Court, in a related context, has found that such grants of unbridled discretion to government agents invites arbitrary enforcement. In City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court held that
when the determination of who may speak and who may not is left to the unbridled discretion of a government official ... we have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.
Id. at 763, 108 S.Ct. 2138; see also Sanjour, 56 F.3d at 97 (“Far from being the saving grace of this regulatory scheme — as the government suggests — the broad discretion that the regulations vest in the agency reinforces our belief that they are impermissible.”). The potential for censorship by the State “justifies an additional thumb on the employees’ side of [the] scales.” See Harman v. City of New York, 140 F.3d 111, 120 (2d Cir.1998) (invalidating agency’s policy requiring prior approval for employee statements to the media) (quoting Sanjour, 56 F.3d at 97). The danger of arbitrary censorship is particularly relevant in the instant case, given the differing views on the merits of research and discussion into sexually-related topics.
The prior approval process does not save the Act even if we could assume that approvals would not be withheld arbitrarily, because the “mere existence of the licensor’s unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.” Lakewood, 486 U.S. at 757, 108 S.Ct. 2138. Thus, even those employees who receive permission to speak will be inclined to engage in self-censorship, ultimately to the detriment of the public in the form of a banal and lifeless discourse on issues of public concern.
The under and overinclusiveness of the Act shows the “obvious lack of ‘fit’ between the government’s purported interest and the sweep of its restrictions.” Sanjour, 56 F.3d at 95. The lack of fit between the Act’s broad restrictions and the interests the Act allegedly was intended to serve “cast[s] serious doubt,” see id., on the Commonwealth’s claim that employees’ access to sexually explicit material has a “necessary impact on the actual operation of the Government.” NTEU, 513 U.S. at 468, 115 S.Ct. 1003 (internal quotation omitted). Consequently, the Act does not survive the heightened scrutiny applied to statutory restrictions on employee speech.
III.
For the foregoing reasons, I would affirm the judgment of the district court.

. In any event, to the extent that Boring controls the public concern analysis in the instant case, and I do not agree that it does, I would revisit that holding. Judge Motz persuasively argued in her dissent in Boring why the majority’s approach to public employees is at odds with Connick and its progeny.