William SANJOUR, et al., Appellants,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al., Appellees.

No. 92–5123.

United States Court of Appeals,
District of Columbia Circuit.

Argued In Banc Feb. 9, 1994.

Decided May 30, 1995.

Stephen M. Kohn, Washington, DC, argued the cause and filed the briefs for appellants.

Alfred Mollin, Senior Counsel, U.S. Dept. of Justice, Washington, DC, argued the cause for appellees. With him on the briefs were Frank W. Hunger, Asst. Atty. Gen. and John C. Hoyle, Sp. Counsel, U.S. Dept. of Justice, Eric H. Holder, Jr., U.S. Atty., Michael J. Singer, Asst. Director, Scott R. McIntosh, Atty., U.S. Dept. of Justice and R. Craig Lawrence, Asst. U.S. Atty., Washington, DC, entered appearances.

David C. Niblack, Washington, DC, filed the brief for amicus curiae Environmental and Civic Organizations.

R.. Craig Kneisel, Asst. Atty. Gen. and Mort P. Ames, Deputy Atty. Gen., Office of the Atty. Gen., Montgomery, AL, for the State of Ala., appeared on the brief pro hac vice for amicus curiae State of Ala.

Before: MIKVA,* Chief Judge, WALD, EDWARDS,** SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

Dissenting opinion filed by Circuit Judge SENTELLE with whom SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges, join.

WALD, Circuit Judge:

William Sanjour and Hugh Kaufman—two employees of the Environmental Protection Agency ("EPA")—and the environmental coalition North Carolina Waste Awareness and Reduction Network ("NC WARN") appeal the district court's dismissal of their First Amendment challenge to regulations prohibiting EPA employees from receiving travel expense reimbursement from private sources for unofficial speaking or writing engagements concerning the subject matter of the employees' work, while permitting such compensation for officially authorized speech on the same issues. *See Sanjour v. EPA,* 786 F.Supp. 1033, 1036 (D.D.C.1992). A panel of this court affirmed the district court's ruling, *see Sanjour v. EPA,* 984 F.2d 434 (D.C.Cir. 1993), but the full court subsequently vacated that decision and set the case for rehearing *in banc. See Sanjour v. EPA,* 997 F.2d 1584 (D.C.Cir.1993). On rehearing, we find that the government has failed to demonstrate that the interests of the employees and their potential audiences in the speech suppressed "are outweighed by that expression's necessary impact on the actual operation of the government." *United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964

---

* Chief Judge Mikva was a member of the Court at the time the case was argued *in banc* but did not participate in its disposition.

** Judge Edwards became Chief Judge prior to the issuance of the opinion.

(1995) ("*NTEU*") (internal quotations and citation omitted). We therefore reverse the district court and hold the no-expenses regulations invalid.

## I. BACKGROUND

### A. *Regulatory Background*

Prior to 1991, when the first of the regulations at issue here was promulgated, employees of the federal executive could accept travel expense reimbursement except from a prohibited *source, i.e.,* a person or group that had or sought business with, or was regulated by, the employee's agency. Exec. Order No. 11,222 (1965); *see also* Office of Gov't Ethics Mem. 84 × 5 at 3–4 (May 1, 1984), *reprinted in* Joint Appendix ("J.A.") at 41, 43–44. All payments other than for actual and necessary travel expenses were prohibited by the honoraria ban in § 501(b) of the Ethics in Government Act of 1978 (codified at 5 U.S.C. app. § 501 (1988 & Supp. V)).[1]

In January 1991, the Office of Government Ethics ("OGE")—charged with establishing the "overall direction" of executive branch policy relating to conflicts of interest, *id.* at § 402—promulgated a regulation containing an important additional restriction on travel expense reimbursement:

An employee is prohibited by the standards of conduct from receiving compensation, including travel expenses, for speaking or writing on subject matter that focuses specifically on his official duties or on the responsibilities, policies and programs of his employing agency.

56 Fed.Reg. 1721, 1724–25 (1991) (codified at 5 C.F.R. § 2636.202(b) (1994)). Several months later, EPA distributed to its employees an advisory letter in which it interpreted the OGE regulation narrowly to prohibit expense reimbursement only for travel involving "non-official" appearances; employees could still receive expenses from private sources for speaking about their "official duties or [ ] EPA's responsibilities, policies and programs" so long as "the required prior approvals ... for official travel" were first obtained. EPA Ethics Advisory 91–1 at 3 (Apr. 2, 1991), *reprinted in* J.A. at 80, 82.

In August 1992, after the district court's decision in this case but prior to argument before the appellate panel, the OGE elaborated its travel reimbursement policy in new, more comprehensive "standards of conduct" governing federal employee compensation. The new regulations on their face prohibit federal employees from "receiv[ing] compensation[2] from any source other than the Government for teaching, speaking or writing that relates to the employee's official duties." 57 Fed.Reg. 35,006, 35,063 (1992) (codified at 5 C.F.R. § 2635.807(a) (1994)).[3]

The OGE ethics provisions must, however, be read together with regulations of the General Services Administration ("GSA"), promulgated under the authority of § 302 of the Ethics Reform Act of 1989, Pub.L. No. 101–194, 103 Stat. 1716, 1745–47 (codified as amended at 31 U.S.C. § 1353).[4] These latter

---

**1.** The Supreme Court has since found that this provision violates the First Amendment rights of executive branch employees, and invalidated it except as applied to senior federal executives. *See NTEU,* —— U.S. at ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

**2.** "Compensation" is defined to exclude "[m]eals or other incidents of attendance ... furnished as part of the event at which the teaching or speaking takes place," but is otherwise quite sweeping. It embraces "any form of consideration, remuneration, or income," including "transportation, lodgings and meals, whether provided in kind, by purchase of a ticket, by payment in advance or by reimbursement after the expense has been incurred." 5 C.F.R. § 2635.807(a)(2)(iii).

**3.** The new regulations define at some length activities that "relate[] to the employee's official duties." Included, for example, are appearances

performed as part of the employee's duties, or that address subject matter involving an ongoing policy of the agency or any matter to which the employee is assigned. Also within the scope of the regulations are activities undertaken in response to an invitation extended either "primarily because of [the employee's] official position rather than his expertise," or "by a person who has interests that may be affected substantially by performance or nonperformance of the employee's official duties." 5 C.F.R. § 2635.807(a)(2)(i)(A–E).

**4.** Section 302 provides that the GSA, in consultation with OGE

shall prescribe by regulation the conditions under which an agency in the executive branch ... may accept payment, or authorize an employee of such agency to accept payment on

regulations permit an agency to "accept payment from a non-Federal source (or authorize an employee to receive such payment on its behalf) with respect to attendance of an employee at a meeting or similar function which the employee has been authorized to attend in an official capacity on behalf of the employing agency." 41 C.F.R. § 304–1.3(a) (1994). They vest broad authority in agency officials to determine when an employee should be "authorized" to participate in a particular meeting, subject to the limitation that the authorizing agency official determine that granting approval "under the circumstances would [not] cause a person with knowledge of all the facts ... to question the integrity of agency programs or operations." *Id.* at §§ 305–1.3, 1.5. Absent such a taint, an "authorized" employee may accept travel and accommodation reimbursement in excess of otherwise applicable per diem rates for government-funded travel. *Id.* at §§ 304– 1.3(d), 1.6, 1.7.[5] The current OGE and GSA regulations thus harmonize with the EPA's interpretation of the OGE regulation originally challenged by appellants; the regulatory scheme as a whole allows employees to receive travel and accommodation reimbursement for "official"—or "authorized"—engagements, but not for activities the agency does not approve.

### B. *Factual Background*

William Sanjour and Hugh Kaufman are EPA employees who, since the late 1970s, have traveled throughout the United States in an unofficial capacity giving speeches that are often critical of EPA policies. They conduct these activities on their own time and depend on travel expense reimbursement from private sources to defray the costs of their speaking engagements.

In late 1991, Sanjour and Kaufman received an invitation from NC WARN to speak in their unofficial capacities at a public hearing concerning a plan to build a commercial hazardous waste incinerator in North-

hampton County, North Carolina. Since the ethics regulations in effect at the time prevented the two from receiving compensation for their necessary travel expenses, they were forced to turn down the speaking engagement. NC WARN subsequently cancelled the event.

### C. *Procedural Background*

In October 1991, Sanjour filed a seven-count complaint in district court against the EPA, its Administrator, and other individual defendants, which was later amended to add Kaufman and NC WARN as plaintiffs and the OGE and its director as defendants. Counts I, III, IV, and V of the amended complaint alleged violations of the First Amendment. Counts II and VII advanced statutory causes of action. Finally, Count VI pled a claim of "selective enforcement and selective prosecution of the plaintiffs in violation of the laws and constitution of the United States."

On defendants' motion for summary judgment, the district court dismissed Counts I–V and VII. The court did not consider plaintiffs' First Amendment challenges count-by-count, but rather construed their pleading to mount a single attack under the balancing test "originally enunciated in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Sanjour v. EPA,* 786 F.Supp. 1033, 1036 (D.D.C.1992). The court did not say whether plaintiffs' challenge, so construed, was "facial" or "as applied," but concluded that "the challenged regulation withstands constitutional attack" because "it is narrowly tailored to meet a legitimate government objective and is not designed to limit First Amendment freedoms." *Id.* at 1037.

The court denied summary judgment on plaintiffs' selective prosecution claim—Count VI—on the ground that it "raise[d] disputed questions of material fact." *Id.* at 1041 n. 15. The court did not specify the precise facts at

---

the agency's behalf, from non-Federal sources for travel, subsistence, and related expenses with respect to attendance of the employee ... at any meeting or similar function relating to the official duties of the employee.

5. Indeed, the GSA regulations allow a non-Federal source to provide such payments for an employee's spouse as well, if the spouse's presence at the meeting is "in the interest of the agency." 41 C.F.R. § 304–1.3(b).

issue, but since a claim for selective enforcement depends on the government either "sing[ling] out [a party] from others similarly situated" or pursuing an individual out of "improper[ ] motivat[ion]," *see Juluke v. Hodel,* 811 F.2d 1553, 1561 (D.C.Cir.1987), further inquiry into the government's actual motivation and its treatment of similarly situated individuals was presumably required.

On plaintiffs' appeal of the district court's disposition of their First Amendment challenge, a panel of this court affirmed. *Sanjour v. EPA,* 984 F.2d 434 (D.C.Cir.1993). The full court vacated that decision and granted rehearing *in banc. Sanjour v. EPA,* 997 F.2d 1584 (D.C.Cir.1993).[6]

## II. DISCUSSION

### A. *The Regulations at Issue*

As a threshold question, we must decide precisely which regulations are under review. The new OGE regulations, including 5 C.F.R. § 2635.807(a), were not promulgated until after appellants initiated this suit, and indeed not until after the district court's entry of summary judgment. Therefore, the district court's review of appellants' constitutional challenge focused on the earlier OGE regulation—5 C.F.R. § 2636.202(b)—and the EPA Ethics Advisory.

■ When reviewing a denial of prospective relief in the form of an injunction or declaratory judgment, however, "[w]e must review the judgment of the [d]istrict [c]ourt in light of [the] law as it now stands, not as it stood when judgment below was entered." *Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972). Of course, in the present case, any such distinction is not consequential since—as we explain *supra* at 3–6—OGE's promulgation of § 2635.807(a) only elaborated the travel reimbursement policy enunciat-

ed in the earlier regulations; it was not intended to effect substantive change.[7] Today, both §§ 2636.202(b) and 2635.807(b) remain in effect and together with the GSA regulations perpetuate the exact same distinction originally challenged by appellants under § 2636.202(b) and the EPA Ethics Advisory—employees may receive travel and accommodation reimbursement for "official" or "authorized" speaking, writing, or teaching engagements, but not for activities the agency does not pre-approve. We therefore consider the constitutionality of this scheme as implemented by both §§ 2635.202(b) and 2635.807(a) (collectively "the regulations").

### B. *The Applicable Standard:* Pickering/NTEU

■ Individuals do not automatically relinquish their rights under the First Amendment by accepting government employment. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). At the same time, however, the Supreme Court has recognized that "Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *NTEU,* —— U.S. at ——, 115 S.Ct. at 1012. Therefore, to determine the validity of a restraint on the speech of government employees, a court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

■ Embedded in the *Pickering* test is the condition that to qualify for its protection, government employee speech must involve "matters of public concern." *See Con-*

---

6. This case was argued *in banc* February 9, 1994. By *per curiam* order of the *in banc* court—*see Sanjour v. EPA,* No. 92–5123 (D.C.Cir. Apr. 28, 1994) (order to hold in abeyance)—our disposition of the case was then postponed pending the decision of the Supreme Court in *United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964 (1995), which issued on February 22, 1995.

7. Government counsel at oral argument explained 5 C.F.R. § 2536.202(b) as "simply a kind of a warning," a "statement that the standards of conduct are something you have to pay attention to." Section 2635.807(a) then "laid out" the applicable "standards of conduct."

*nick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). The government concedes that the speech at issue here satisfies this prerequisite. We think this concession a necessary one. The challenged regulations clearly prevent Sanjour, Kaufman and other executive branch employees from addressing current government policies, perhaps the paradigmatic "matter[ ] of public concern."

That the *Pickering* balancing test applies in this case is thus eminently clear; the manner of its application, however, is somewhat less so. *Pickering* and most of its Supreme Court progeny involved disciplinary actions taken against individual employees; the Court weighed the impact of the speech giving rise to the action on that employee's performance of her public responsibilities. *Cf. Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Sanjour,* in contrast, involves regulations proscribing a broad category of speech by a large number of potential speakers.

Fortunately, the Supreme Court's recent decision in *NTEU* offers useful guidance on how to apply *Pickering* in such a case. *NTEU* involved a challenge by two unions and several career civil servants to § 501(b) of the Ethics in Government Act, 5 U.S.C. app. § 501(b) (1988), which prevented "officer[s] or employee[s]" of the federal government from "receiv[ing] any honorarium." The Court observed that the statute represented a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," and therefore "[gave] rise to far more serious concerns than could any single supervisory decision." *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. It concluded that

the government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action. The government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the government. *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736.

*NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. This, then—the *Pickering/NTEU* test—is the standard we apply in this case.

## C. *The Nature of Appellants' Challenge*

Before turning to that application, however, another preliminary matter requires attention—the nature of appellants' First Amendment challenge to the regulations. The panel majority ascribed critical significance to its view that only a "facial" attack on the regulations is before us, and that an "as-applied" challenge awaits the attention of the district court below. *See Sanjour,* 984 F.2d at 437. We think this assertion is not supported by the record, and in any event the distinction is largely irrelevant in the context of the *Pickering/NTEU* analysis.[8]

■ . First, the notion that the district court ruled only on a "facial" challenge while allowing appellants to proceed on an "as-applied" theory is incorrect. While neither the word "facial" nor the term "as applied" appears anywhere in the district court's opinion—*see Sanjour,* 786 F.Supp. at 1034–41— that court clearly purported to dispose of the entirety of appellants' First Amendment challenge. It broadly held that "the challenged regulation . . . does not violate the plaintiffs' First Amendment rights," *id.* at 1038, and dismissed Counts I and III–V of the Complaint, the only counts alleging First

8. The dissent professes surprise that "in this day of notice pleading it makes any difference" to us how appellants' claim is characterized "in a term of art sense," and suggests that our difference of opinion with the panel majority's characterization is only a matter of "semantics." Dissent at 105. Far from it. Because the panel majority believed that appellants' challenge was technically a "facial" challenge, it imposed on appellants the "heavy burden"—developed by the Supreme

Court in facial overbreadth cases—"of showing that the [challenged] regulation could never be applied in a valid manner or is so broad that it may inhibit the constitutionally protected speech of third parties." *See Sanjour,* 984 F.2d at 441. Our analysis therefore diverges from that of the panel majority in substantial part because we disagree with its characterization of appellants' challenge, and so with its improper allocation of that "heavy burden" to appellants.

Amendment violations.[9]  We cannot but conclude that the whole of appellants' First Amendment challenge—however characterized—is now before us on appeal.

More important, however, we doubt the centrality of the "facial"/"as-applied" distinction in the *Pickering/NTEU* context.  Indeed, in *NTEU* itself the Court did not categorize the employees' challenge as either "facial" or "as applied."  This was not an oversight; the fact is that the test enunciated in *NTEU* for determining the constitutionality of a statute or regulation restricting government employee speech requires the reviewing court to consider whether the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the government."  *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014 (internal quotations and citation omitted).  Because this same test—which requires the court to go beyond the facts of the particular case before it—presumably applies to both "facial" and "as-applied" challenges, the distinction between the two is largely elided.[10]

In this regard, the present case resembles *Edenfield v. Fane,* —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).  Fane challenged a Florida Board of Accountancy rule prohibiting direct, personal solicitation of business clients.  The relevant First Amend-

9.·  The court denied summary judgment only on Count VI, which alleged "selective enforcement and selective prosecution of the plaintiffs in violation of the laws and constitution of the United States."  "Selective enforcement" is not, of course, a First Amendment cause of action; rather, as the Second Circuit has aptly observed, it lies in "a murky corner of equal protection law."  *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir. 1980).  To prevail on a claim of selective enforcement in this circuit, a plaintiff must show that he was "singled out from others similarly situated or that [his] prosecution was improperly motivated."  *Juluke v. Hodel,* 811 F.2d 1553, 1561 (D.C.Cir.1987); *see also* Memorandum in Support of Defendants' Renewed Motion to Dismiss Count 6 of Plaintiffs' Amended Complaint at 5, *Sanjour v. EPA,* 786 F.Supp. 1033 (D.D.C. 1992).  The critical inquiry in such cases is thus not whether legislation is constitutional "as applied" to a particular set of facts, but rather whether the government may constitutionally "apply" the same rule to some individuals but not to others similarly situated.

Of course, a plaintiff may prevail on a "selective enforcement" claim by showing that the government's motive in selectively prosecuting him was to "prevent or paralyze [the] . . . exercise of [his] constitutional rights."  *See United States v. Mangieri,* 694 F.2d 1270, 1273 (D.C.Cir. 1982).  In some cases, this may involve determining whether plaintiff was in fact attempting to exercise constitutionally protected rights, including First Amendment rights.  This inquiry, however, remains subordinate to the question of the government's motivation; it does not transform an equal protection "selective enforcement" claim into a First Amendment "as-applied" challenge.

We note that the panel was not the progenitor of this confusion.  The district court's order denying defendants' renewed motion to dismiss Count VI and staying that claim during the pendency of this appeal stated that "plaintiffs' claim [in Count VI] that the regulation at issue is unconstitutional as applied is sufficient to survive a motion to dismiss."  *Sanjour v. EPA,* Civ. No. 91–2750 (D.D.C. June 9, 1993).  It would have been more accurate—and less confusing, given the use of "as applied" as a term of art in First Amendment law—to say that plaintiffs' claim that the government's "selective application" of the regulation was unconstitutional could not be dismissed on summary judgment.

10.  The usual distinction between "as-applied" and "facial" challenges is that the former ask only that the reviewing court declare the challenged statute or regulation unconstitutional on the facts of the particular case; the latter, in contrast, request that the court go beyond the facts before it to consider whether, given all of the challenged provision's potential applications, the legislation creates such a risk of curtailing protected conduct as to be constitutionally unacceptable "on its face."  *See City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 796–98 & nn. 12–16, 104 S.Ct. 2118, 2124–25, nn. 12–16, 80 L.Ed.2d 772 (1983).  The *Pickering/NTEU* test's requirement that the reviewing court consider the spectrum of speech suppressed in determining the constitutionality of the challenged legislation blurs this distinction.

We are in this case, of course, concerned only with "facial" or "as-applied" challenges in which plaintiffs seek primarily to vindicate their own first amendment rights.  We are not concerned with the exception to traditional standing requirements known as "overbreadth" doctrine, which permits parties whose own conduct is clearly unprotected to assert the rights of third parties not before the court.  For seminal examples of facial challenges brought by parties seeking to vindicate their own rights, *see Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

ment test, developed in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), required the Court to determine whether the challenged regulation advanced substantial state interests in a direct and material way, and if so to consider whether the burden on speech was reasonably proportioned to the state interests served. Thus the Court was essentially called upon to balance the state's interest in suppressing a category of expression against the citizenry's interest in that speech, the same balance we must strike in *Sanjour.* Fane's challenge, the Court has since observed, was an "as applied challenge to a broad category of commercial solicitation"; the Court "did not suggest that Fane could challenge the regulation on commercial speech as applied only to himself or his own acts of solicitation," *United States v. Edge Broadcasting Co.,* — U.S. —, —, 113 S.Ct. 2696, 2706, 125 L.Ed.2d 345 (1993), but rather weighed the interests of individuals in Fane's position generally against the government's interest in suppressing the relevant category of speech.

The most accurate characterization of appellants' challenge may therefore be—following *Fane*—that it is an "as applied challenge to a broad category of [non-official employee speech]." Nevertheless, while analyzing this broad category of speech requires that we look beyond the particular facts of the appellants' case, we cannot go so far as to include every possible application of the challenged scheme. As the Supreme Court noted in *NTEU,* the balancing of interests relevant to senior executive officials might "present[ ] a different constitutional question than the one we decide today." — U.S. at —, 115 S.Ct. at 1018. We therefore express no view on whether the challenged regulations may be applied to senior executive employees.

### D. *Applying* Pickering/NTEU

We begin our substantive discussion of the regulations by briefly enunciating the interests on either side of the *Pickering/NTEU* balance. We then examine several attributes of the regulations that we think must inform our evaluation of the weight to be assigned the competing interests.

#### 1. *Interests of the Employees and the Public*

We have already noted the nature of the employees' interest in this challenge; their interest lies in receiving reimbursement for travel expenses necessary to make "teaching, speaking or writing" appearances on matters that "relate[ ] to the [their] official duties." *See* 5 C.F.R. § 2635.807(a). The government concedes that the speech at issue touches on "matters of public concern," thus satisfying the threshold requirement for protection under *Pickering.*

The government contends, however, that because the regulations do not "ban" speech concerning employees' "official duties," but only remove an incentive to speak on these matters, the regulations impose only a "moderate" burden on appellants and others similarly situated. This argument was also made in *NTEU,* where the Supreme Court rejected it:

> [The honoraria ban's] prohibition on compensation unquestionably imposes a significant burden on expressive activity.... Publishers compensate authors because compensation provides a significant incentive toward more expression. By denying respondents that incentive, the honoraria ban induces them to curtail their expression if they wish to continue working for the government.

*NTEU,* — U.S. at —, 115 S.Ct. at 1014 (citations omitted).

Of course, the burden described by the Court in *NTEU* is far greater in the present case. As Judge Sentelle wrote in his dissent from the decision of the *NTEU* panel:

> [T]he [honoraria] ban imposes *significantly* less of a burden on appellees' First Amendment rights than did the [regulations] upheld [by the panel] in *Sanjour.* Unlike the [*Sanjour* regulations], the ban allows employees to recover all of the costs they necessarily incur in expressive activity. The ban only prevents employees from *profiting* from their outside activities.

*National Treasury Employees Union v. United States*, 990 F.2d 1271, 1286 (D.C.Cir. 1993) (emphasis in original). By denying government employees the ability to recover even necessary travel expenses, the regulations here represent a greater impediment to their attempts to publicize their views than did the honoraria ban struck down by the Court in *NTEU*, which did not affect such expenses at all.[11]

■ Under *NTEU*, we must weigh on the employees' side of the balance not only the interests of "present and future employees" in a broad range of inhibited "present and future expression," but also the interests of their "potential audiences"—such as NC WARN—in receiving the speech suppressed. *NTEU*, —— U.S. at ——, 115 S.Ct. at 1014. This interest is manifestly great; as numerous courts and commentators have observed, government employees are in a position to offer the public unique insights into the workings of government generally and their areas of specialization in particular. *See, e.g., Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir.1989) ("[P]ublic employees have valuable insights and information about the operation of the government to convey.);" *Developments in the Law—Public Employment*, 97 HARV.L.REV. 1611, 1768 (1984) ("[P]ublic employees, by virtue of their expertise and experience, are often among the citizens who are best informed ... and [ ] their opinions are thus especially valuable to the public."). Depriving NC WARN and the general populace of government employees' novel and valuable perspective would therefore require a serious and carefully considered justification.

### 2. *The Government's Interest*

During the course of this litigation, the EPA has advanced two interests that it claims the challenged regulatory scheme advances. Before the district court and the appellate panel, appellees urged primarily that the regulations represent an attempt to "protect against the appearance of impropriety in the actions of their employees." *See, e.g., Sanjour*, 786 F.Supp. at 1037. The nub of this claim was that when a government employee accepts travel expense reimbursement from a private party the employee may, to the general public, appear beholden to the private interest and prone to provide illicit regulatory "favors" in return.

Indeed, some such arrangements certainly could evoke the specter of partiality on the part of government employees. The danger in these transactions bears no relation, however, to the distinction between "official" and "unofficial" employee speech—the line drawn by the challenged regulatory scheme—but rather derives from the private *source's* interest in the future actions of the employee's agency. Provided that the reimbursing party has an interest in the actions of the reimbursed employee, the appearance of impropriety is the same regardless of the agency's approval or disapproval of the "reimbursement." Because the government cannot single out speech for restriction on the basis of a criterion bearing "no relation [ ] to the particular interest[ ] ... asserted," *City of Cincinnati v. Discovery Network*, —— U.S. ——, ——, 113 S.Ct. 1505, 1514, 123 L.Ed.2d 99 (1993), the EPA's abandonment of this justification before the *in banc* court was judicious.

The government now argues that "[t]he relevant governmental interest is the threat to the integrity of the government occasioned by employees using their *public office* for *private gain*." Appellees' Brief at 24 (emphasis in original). The current core evil to be averted thus lies in government employees "selling" their labor twice—once to the government as employer, and once, in the form of speech about their employment, to

---

11. For this same reason, we also reject the government's alternative formulation of the "moderate burden" argument, which claims that "while the standards of conduct may well have the periodic effect of curtailing *travel*, there is no reason why they should materially curtail *speech*, given the numerous alternative means of communication (such as videotape and teleconferencing) that do not require an employee to journey to his audience." Supplemental Brief for Appellees at 8 (emphasis in original). Once again, we think the crucial point is that the regulations prevent speakers from even covering the costs—whether in the form of travel expenses or equipment fees—of their expressive activities. Making speech *more* expensive, as here, has to impose a greater burden on speech than making it *less* remunerative, as in *NTEU*.

private parties willing to provide travel reimbursement in return. The government argues that even when there is no reason to suspect the private donor is attempting to curry favor with the reimbursed employee, the employee's acceptance of benefits from a private source is inappropriate in itself, and may cause the public to lose faith in the single-minded dedication of government employees to the public interest. *Cf.* ROBERT G. VAUGHN, CONFLICT-OF-INTEREST REGULATION IN THE FEDERAL EXECUTIVE BRANCH 37 (1979) ("[P]ractices that enrich government employees beyond their appropriate compensation solely because of their status as government employees undermine public faith and confidence."). The government contends that the regulations are designed to prevent this sort of "dual compensation."

### 3. *Underinclusiveness of the Regulations*

■ Several features of the regulations cast serious doubt on the government's submission that the potential for "dual compensation" so menaces the "actual operation of the government," *NTEU*, —— U.S. at ——, 115 S.Ct. at 1014, as to render the regulations' significant restriction of employee speech an acceptable response. Foremost is the obvious lack of "fit" between the government's purported interest and the sweep of its restrictions. There is a patent incongruity between the two that features both an "underinclusive" and an "overinclusive" component.

The regulations' underinclusiveness is their most troubling feature. As we have explained, *see supra* at 88–89, the challenged regulatory scheme permits government employees to receive reimbursement for luxurious travel and accommodations so long as the agency approves their activities. But the benefit accruing to an employee from a week relaxing in four-star hotels and regaling on five-course feasts at the expense of a private party is in no way diminished by first obtaining agency approval. Because the government has thus not even attempted to regulate a broad category of behavior—reimbursement for "official" employee appearances—giving rise to precisely the harm that supposedly motivated it to adopt the regula-

tions, we have trouble taking the government's avowed interest to heart. *Cf. Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1514 (holding a ban on commercial but not noncommercial newsracks an "impermissible means of responding to the city's admittedly legitimate interest" in safety and esthetics of its streets); *Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443 (1989) (professing "serious doubts about whether [the government] is, in fact, serving ... the significant interests which [it] invoke[d]" where it had failed to regulate a substantial part of the activity giving rise to the alleged harm); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104–05, 99 S.Ct. 2667, 2671–72, 61 L.Ed.2d 399 (1979) (striking down a statute prohibiting dissemination of juvenile defendants' names because, *inter alia*, the law did not regulate electronic media and therefore could not accomplish its stated purpose).

The government responds to this charge of underinclusiveness by arguing that the official/unofficial distinction serves the critical purpose of assuring that private monies will be accepted only for undertakings that "further[ ] the public good." So long as the agency ensures that this condition is satisfied, the government urges, there is no difference between "reimbursement of an employee's expenses [ ] from appropriated funds" and reimbursement from "authorized augmentations of appropriations." Appellees' Brief at 31–32.

But this line of argument cannot justify the distinction drawn by the regulations. Presumably, nearly all aspects of an official's job could be described as "further[ing] the public good." Yet the very nub of the government's "dual compensation" concern is that it is inappropriate for private parties to compensate government employees for doing their jobs. We cannot see how agency approval of employee reimbursement addresses the core evil of "dual compensation" at all—the employee receives the same private benefit whether the agency "approves" or not. On the other hand, the difference between "reimbursement of an employee's expenses [ ] from appropriated funds" and reimbursement from "authorized augmentations of ap-

propriations" appears to us quite plain; only the latter situation raises the possibility that the government employee is improperly "selling" its government labor to both the government and a private party, since in the former case the government itself is the only "buyer."

Nor do we agree with the government's contention that stamping generous perquisites [12] with official approval will alleviate any public perception that officials may be using their government offices for private gain. Indeed, officially sanctioned benefits from private sources would appear to create a greater appearance that government employment systematically translates into social advantage than would the unsanctioned perks of individual bureaucrats. At a minimum, however, we believe that both the private gain actually derived from public office and the public perception thereof are equally as great when the speech occasioning the gain is officially approved as when it is not.

The dissent, while apparently acknowledging that the regulations are underinclusive when measured against the "dual compensation" justification actually advanced by the government, attempts to evade our conclusion by reformulating the government's interest. It proposes that the regulations were not designed to regulate "personal gain from public office" generally, but only that personal gain arising from "accommodating third-party interests external and potentially adverse to the agency." Dissent at 6. The dissent therefore finds a "tight 'fit'" between the regulations and their purported aim. Dissent at 101–102.

■ The *Pickering/NTEU* question, however, is not whether some conceivable "governmental" interest might be constitutionally advanced by the regulations; as the Supreme Court explained in *Fane*—under the similar commercial speech balancing test—we must limit our inquiry to the "interests the State itself asserts." *Fane,* —— U.S. at ——, 113

S.Ct. at 1798. The applicable standard "does not permit us to supplant the precise interests put forward by the [government] with other suppositions." *Id.*

■ Moreover, even if the government had asserted the interest conjured by the dissent—and we can find no evidence that it did—the regulatory scheme at issue here would still be an impermissible means to achieve it. For the regulations vest broad authority in the agency to prevent an employee from accepting reimbursement for *any* appearance, whether or not it would involve "interests ... potentially adverse to the agency." Therefore, while the regulatory scheme might not be "underinclusive" when measured against the dissent's freshly-minted "governmental" interest, it would still run afoul of the Supreme Court's disapproval of regulations vesting essentially unbridled discretion in a government decisionmaker to restrict speech on the basis of the viewpoint expressed.

### 4. *Restricting Anti-government Speech*

■ It is perhaps the most fundamental principle of First Amendment jurisprudence that the government may not regulate speech on the ground that it expresses a dissenting viewpoint. *Cf. R.A.V. v. City of St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (invalidating a hate-speech ordinance on the ground that it singled out and suppressed concededly proscribable "fighting words" on the basis of the viewpoint expressed). Although the government asserts an interest ostensibly unrelated to the content of the employees' speech—preventing private gain from public office—in practice the regulations almost certainly restrict a subcategory of such speech on the basis of the viewpoint expressed. The regulations permit official approval only for speech that is "within the mission of the agency." Appellees' Brief at 16. It therefore appears that employees may receive private reimbursement for travel costs neces-

---

12. The dissent suggests that because the "propriety of lavish accommodations must be considered by the agency in accepting reimbursement," "[a]ny [ ] danger of improper benefit to an agency employee [from "authorized" reimbursements] ... is more apparent than real." Dissent

at 8. It does not deny, however—nor could it— that an "authorized" employee may accept travel and accommodation reimbursement in excess of otherwise applicable per diem rates for government-funded travel. 41 C.F.R. §§ 304–1.3(d), 1.6, 1.7 (1994).

sary to disseminate their views only by toeing the agency line.

In its attempt to exorcise this specter of viewpoint discrimination, the government makes much of the fact that an employee might or might not receive reimbursement for precisely the same speech, depending only on whether he gets agency approval; the government concludes that "[b]ecause the two speeches are identical, the employee's entitlement to reimbursement does not turn upon viewpoint, but upon something else." *Id.* at 33. There is a superficially logical quality to that reasoning, but on closer analysis we do not think that the conclusion follows from the premise. Certainly the government *could* choose to approve or disapprove precisely the same speech—the more important point, however, is that the regulatory scheme vests essentially unbridled discretion in the agency to make the determination on the basis of the viewpoint expressed by the employee.

Far from being the saving grace of this regulatory scheme—as the government suggests—the broad discretion that the regulations vest in the agency reinforces our belief that they are impermissible. Outside the *Pickering* context, the Supreme Court has expressed its disapproval of similar discretionary provisions that enable the government to control speech. In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763, 108 S.Ct. 2138, 2147, 100 L.Ed.2d 771 (1988), the Court wrote:

> [A] law or policy permitting communication in a certain way for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.... [W]e have often and uniformly held that such statutes or policies impose censorship on the public or press, and hence are unconstitutional....

We think that the regulatory scheme challenged here "pose[s] a real and substantial threat of the [ ] censorship risks" identified

by appellants, *id.* at 759, 108 S.Ct. at 2145, and that in the context of *Pickering* balancing this potential justifies an additional thumb on the employees' side of our scales.

### 5. *Overinclusiveness*

■ Given the government's asserted interest in preventing government employees from using their public office to obtain private gain, the regulations are nearly as troublingly overinclusive as they are underinclusive. Clearly, the government's interest in restricting speech must be balanced against the interests of the employees and the public in the entire category of speech potentially suppressed. *See NTEU*, —— U.S. at ——, 115 S.Ct. at 1014. If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation. In performing the *Pickering* balance, therefore, the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (noting, outside the *Pickering* context, that the government may not "burden substantially more speech than necessary to further the government's legitimate interests").

Indeed, this requirement appears close to the heart of the Supreme Court's decision in *NTEU*. The Court cautioned there that the government should at least have limited its attempt to prevent any "appearance of impropriety" arising from employees accepting honoraria for outside engagements to those activities involving the officials' employment—though it also noted that "[o]ne might reasonably argue that expressive activities, because they occupy a favored position in the constitutional firmament, should be exempt" from even such a ban. *See NTEU*, —— U.S. at ——, 115 S.Ct. at 1017. So, too, the regulations here are overinclusive, albeit in a different way.[13] We doubt that a bus ticket

---

**13.** The dissent appears to suggest that the government's failure to require a nexus between a government employee's job and the subject matter of his expression—as in *NTEU*, —— U.S. at ——, 115 S.Ct. at 1018—is the *only* way regulations governing employee speech could be over-

to Baltimore and a box lunch en route could possibly be construed as using public office for private "gain," yet they would be equally as offensive to the challenged regulations as a lobster and a Lear jet to Lake Tahoe. Although we do not suggest that the *Pickering* test contains a "least restrictive means" component, we believe that the extraordinary reach of the challenged regulations places a heavy justificatory burden on the government—or put another way, the great quantity of speech affected by the regulatory scheme weighs heavily on the side of the employees.

### 6. *Insufficient Justification of the Regulatory Scheme*

Finally, the government's failure to demonstrate that the challenged regulatory scheme addresses genuine harms also contributes to our reluctance to weigh its interest heavily in the *Pickering* balance. Precedents of both the Supreme Court and this court support the relevance of this factor to our *Pickering* analysis.

In *Edenfield v. Fane*, —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Court required that the government demonstrate actual harm before its interest may be deemed to justify a restriction on speech such as that challenged here. *Fane* concerned the regulation of commercial speech, where the courts apply the *Central Hudson* balancing test, which closely resembles the standard we apply today. *See supra* at 92–93. The *Fane* Court wrote that the government's "burden [of justifying the restriction] is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on ... speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." —— U.S. at ——, 113 S.Ct. at 1800.

■ The Court's recent decision in *NTEU* verifies that the government's failure to show that· its· suppression of employee speech addresses genuine harms must inform the *Pickering* balance. The Court wrote that

> [w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.... It must demonstrate that the recited harms are real[ and] not merely conjectural....

*NTEU*, —— U.S. at ——, 115 S.Ct. at 1017 (quotations and citation omitted). The Court also distinguished its earlier decision in *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), on the ground that Congress had designed the Hatch Act to "combat the *demonstrated ill effects* of government employees' partisan political activities," *NTEU*, —— U.S. at ——, 115 S.Ct. at 1015 (emphasis supplied); but in *NTEU*, the government had "cite[d] no evidence of misconduct related to honoraria in the vast rank and file of federal employees" affected by the challenged statutory provision. *Id.* An identical governmental oversight similarly colors our review in this case; neither the EPA nor the OGE has made any effort to demonstrate that the severe measures at issue here were adopted to address genuinely experienced harms.

In *Pickering* review of government actions against individual employees this court has already required that the government demonstrate actual harms to justify suppression of speech. We explained in *American Postal Workers Union v. United States Postal Service*, 830 F.2d 294, 303 (D.C.Cir.1987) ("*APWU*"), that because the government bears the affirmative burden of "justifying" actions stifling employee expression, the employee must prevail in the *Pickering* balancing "[g]iven the absence of any *demonstrated* harm" (emphasis supplied). We think that this pronouncement applies with still greater force here than in *APWU*, because the "government's burden [of justification] is greater" in the context of a broad "[regulatory] restriction on expression" than in an action

---

inclusive. *See* Dissent at 103–104, 105 ("That which the *NTEU* honoraria ban lacked, i.e. a requirement that the regulated speech be con-

nected to the employee's official duties, save the regulations here."). We can see no basis for that supposition.

against an individual employee. *NTEU*, —— U.S. at ——, 115 S.Ct. at 1014.

### III. CONCLUSION

■ Government employee speech is protected by the First Amendment, and can only be infringed when the government demonstrates that the burden on such speech is "outweighed by [its] necessary impact on the actual operation of the government." *See id.* (internal quotations and citation omitted). The regulations challenged here throttle a great deal of speech in the name of curbing government employees' improper enrichment from their public office. Upon careful review, however, we do not think that the government has carried its burden to demonstrate that the regulations advance that interest in a manner justifying the significant burden imposed on First Amendment rights. We therefore reverse the decision of the district court, and remand the case for proceedings consistent with this opinion.

*Reversed and remanded.*

SENTELLE, Circuit Judge, dissenting, with whom SILBERMAN, WILLIAMS, and HENDERSON, Circuit Judges, join:

Much disagreement arises from semantics. How one reacts to an issue is greatly influenced by how one phrases the issue. Indeed, how one regards the resolution of an issue of public policy may be in part determined by whether one perceives the framer of legislation or legislative regulation as responding to one problem or a series. One writer, addressing legislative-objective questions in the context of equal protection law, has noted that the division of legislative purpose into single, simplified goals, each considered separately, could provide apparent support for a misleading conclusion that the legislation in question is overinclusive or underinclusive as to each step taken separately when the legislation might evidence a perfectly rational approach to "[t]he legislature's overall purpose...." Robert F. Nagel, Note, *Legislative Purpose Rationality and Equal Protection*, 82 YALE L.J. 123, 127 (1972). Otherwise put, "[C]ourts sometimes ignore the clear import of a statute's terms to formulate a fictional statutory goal to which the terms are not rationally related." *Id.* at 154.

Similarly, in First Amendment *Pickering* analysis, whether a regulation survives the balance "between the interests of the [employee], as a citizen" on the one hand and promotion of "the efficiency of the public services [the agency] performs through its employees," on the other, *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), may depend on how the Court's expression of the purpose behind the regulation divides or groups the problems addressed by the agency. In striking down the regulations before us, the majority rejects as both underinclusive and overinclusive the regulations as directed to the goals of protecting against an appearance of impropriety and the threat to their integrity created by government employees' use of public office for private gain. I suggest that a different reaction may be triggered by a different phrasing of the problems addressed by the agencies in their issuance of the regulations.

Ask first: "Should an employee traveling to deliver an official speech on behalf of an agency have to bear his own expenses?" I suggest the ready answer is, "No, the agency should reimburse him."

If the question is next asked, "If an agency is sending an employee to travel to a remote location to deliver an official speech beneficial to both the agency and to a private entity represented in the employee's audience, is it irrational for the agency to benefit the public fisc by accepting from the private entity payment for some or all of the employee's expenses?" Again, I suggest the ready answer is, "No, it is perfectly rational for an agency acting for the mutual benefit of the taxpayers and a private entity to accept reimbursement from the private entity."

Next question: "Should a federal employee who wishes to, on his own time, and for his own reasons, travel to speak to a private group and deliver unofficial speech not on behalf of his agency, but about subjects which make his appearance valuable because of his relation to the agency, be reimbursed by the agency for his expenses?" Again, I think the answer to that question is, "No."

Next question: "Should an employee be able to enrich himself by reason of his government service in ways which could divide his loyalty to the taxpayer-supported entity to which he answers?" Again, the ready answer is, "No."

Finally: "Is the ability to travel free to the places of one's own choosing a form of enrichment?" My answer would be, "Yes."

Thus viewed, I think the commonsense analysis of the goals addressed by the regulations before us is that they are not only rational, but perfectly proper. Given that understanding of the goals, I then submit that the *Pickering* balance establishes that the limited burden placed on the speech rights of the employees involved is constitutional. Certainly reasonable persons might differ on the proper phrasing of the issues, as on the result. But the ability to differ from an agency does not imply the propriety of a court setting aside that agency's reasoned decisions. I submit for the reasons already stated that the regulations represent a reasoned judgment, and for the reasons below, I suggest that they represent a legally sound one.

## LEGAL ANALYSIS

### A. *The Framework*

As the majority rightly declares, *Pickering v. Board of Education* provides the framework for determining the validity of this regulation of public employee speech. In applying *Pickering,* we must "arrive at a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. Undeniably, the majority is correct that government employees generally, and those bringing this action specifically, have an interest in commenting on the workings of the agency wherein they are employed, and the concerns they address at least sometimes rise to the status of "public concern," in *Pickering* terms. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). Also,

even conceding that the restriction of reimbursement imposes a "significant burden on expressive activity," *United States v. National Treasury Employees Union ("NTEU"),* —— U.S. ——, ——, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964 (1995), these burdens may be outweighed by legitimate government interests. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35.

On the government's side of the scale rests the "undeniably powerful" interest of the government in preventing the actual or apparent misuse of government position or power. *NTEU,* —— U.S. at ——, 115 S.Ct. at 1016. Although I thus generally agree with the majority as to the nature of the balance we are striking, I disagree as to the relative weight on each side in *Pickering* terms.

### B. *The Government's Interest and the Tailoring of the Regulation*

In advancing the OGE regulation, 5 C.F.R. § 2635.807(a) (1994), and the GSA regulations, 41 C.F.R. § 304–1.3(a) (1994), the agencies served a facially legitimate government interest. As the majority notes, "appellees [have] urged primarily that the regulations represent an attempt to 'protect against the appearance of impropriety in the actions of their employees.'" Maj. op. at 94 (quoting *Sanjour v. EPA,* 786 F.Supp. 1033, 1037 (D.D.C.1992)). As the majority further notes, this claim proceeds from the proposition that when "a government employee accepts travel expense reimbursement from a private party the employee may, to the general public, appear beholden to the private interest and prone to provide illicit regulatory 'favors' in return." Maj. op. at 94. Without casting aspersions on the individual appellees before us, it is not impossible that this appearance might blend into reality. That is, some government employees, upon receiving payments from private interests might consciously or unconsciously shape their official conduct in ways beneficial to those private interests. It is traditional learning that "[n]o man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other." *Matthew* 6:24 (King

James Version). When an employee is paid for his speech and expressive conduct by two "masters," his loyalty is similarly divided.

Protecting against this division and the appearance of the same is a governmental interest recognized as legitimate by the Supreme Court in *NTEU*. *See* ―― U.S. at ――, 115 S.Ct. at 1018. Indeed, the *NTEU* Court recognized that the courts have an "obligation to defer to considered congressional judgments about matters such as appearances of impropriety." *Id.* Given the ability of Congress to make limited delegation of its legislative decisions to appropriate regulatory agencies, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), I would assume the same deference applies to cases of regulatory agencies, such as OGE and GSA, acting within their designated realm, and as well to ethics offices of employing agencies such as EPA acting to supervise their employees. With or without that deference, the regulations before us will pass their first test, that is, the service of a legitimate governmental interest, unless something in the *NTEU* analysis renders that interest or the regulation's service of the interest illegitimate. Nothing does.

In fashioning its remedy for the unconstitutionality of the statute in *NTEU*, the Supreme Court implied that regulation of remuneration for employee speech could be upheld provided there was a proper "nexus between the speaker's official duties and either the subject matter of the speaker's expression or the identity of the payor." ―― U.S. at ――, 115 S.Ct. at 1019. In that case, the Court struck down the remedy crafted by this court not because the government may not limit its employees' speech where such a nexus exists, but rather because the congressional ban had not limited the speech affected to that having such a nexus and because we had gone beyond our role in redefining the nexus for Congress. *Id.* at ―― – ――, 115 S.Ct. at 1018–19. In this case, the regu-

lation on its face confines the affected speech to that having such a nexus, specifically forbidding employees from "receiv[ing] compensation" from nongovernmental sources only "for teaching, speaking, or writing that *relates to the employee's official duties*." 5 C.F.R. § 2635.807(a) (1994) (emphasis added).

The regulations, then, serve a legitimate governmental purpose and should be upheld unless the interests of the appellees outweigh the governmental interest served, or insufficient tailoring causes them to violate the First Amendment by being invalidly overinclusive or underinclusive to serve purported interests of the government.

## C. *Underinclusive?*

The majority brands the regulations as underinclusive because of the distinction drawn between "official" appearances (for which reimbursement may be accepted) and "unofficial" appearances (for which it may not).[1] I would submit that this distinction must be drawn for the regulations to exist at all. Even the majority does not challenge the ability of the government itself to reimburse its employees for their official travel. It is difficult to see how any agency, especially one with the public educational mission of the Environmental Protection Agency, could function without that power. Given its charter, and the reality of necessary travel expenses, it is impossible to dispute the proposition that the government may reimburse its employees for the expenses of travel undertaken.

For appellant and the majority, the difficulty arises with the regulatory decision advanced by GSA in 41 C.F.R. § 304–1.3(a) and as applied by the EPA in permitting reimbursement by private entities of the travel expenses of employees making "official" appearances but not "unofficial" appearances. The majority deems this differing treatment to constitute underinclusiveness, in the view that "reimbursement for 'official' employee

1. The majority suggests that the regulations here would prevent a speaker from communicating with a potential audience not only by forbidding the recovery of travel expenses, but also of equipment costs. *See* Maj. Op. at 94 n. 11. From the

face of the regulations, they prohibit only the receipt of "compensation, including *travel* expenses...." 5 C.F.R. § 2636.202(b) (emphasis added).

appearances—giv[es] rise to precisely the harm that supposedly motivated [the government] to adopt the regulations." Maj. op. at 95. This is accurate only if the governmental objective—that is, the harm to be prevented—is the one defined by the majority. More accurately viewed, however, that harm exists where an employee profits from the use of his governmental position to serve his personal ends, by accommodating third-party interests external and potentially adverse to the agency. The same danger of harm does not exist where the employee is making an "official" appearance as defined in the regulations.

> The OGE regulations specify that:

> An employee is prohibited by the standards of conduct from receiving compensation, including travel expenses, for speaking or writing on subject matter that focuses specifically on his official duties or on the responsibilities, policies and programs of his employing agency.

5 C.F.R. § 2636.202(b) (1994). This regulation, on its face, serves the purpose of preventing personal profit from an official position. The EPA Ethics Advisory we considered in the panel opinion, EPA Ethics Advisory 91–1 at 3 (April 2, 1991), narrowly construed that regulation to prohibit travel expense reimbursement only for "not official" appearances, while exempting "official" travel where "required prior approvals" had been obtained. Under the more recently enhanced guidance of the General Services Administration regulation, an *agency* is permitted "to accept payment from a non-Federal source (or authorize an employee to receive such payment on its behalf) with respect to attendance of the employee at a meeting or similar function which the employee has been authorized to attend in an official capacity on behalf of the employing agency." 41 C.F.R. § 304–1.3(a) (1994).

Thus, the danger that the employee will profit by receiving travel he desires in addition to his governmental salary is policed by the agency in the case of official travel. The employee is not, in that instance, traveling for his own ends or profiting by making a trip chosen by himself to meet with associates of his own choosing. Rather, in that case he is traveling to be about the business of his only master, the Environmental Protection Agency.

Any further danger of improper benefit to an agency employee while doing the business of the government—illustrated by the lavish accommodations described in the majority's opinion, *see* Maj. Op. at 95, is more apparent than real, given the actual nature of the reimbursement allowable. GSA's regulation specifies that the *agency* may "accept payment from a non-Federal source (or authorized employee to receive such benefit on its behalf)," 41 C.F.R. § 304–1.3(a), only where the reimbursement of the agency for the employee's travel survives the conflict of interest analysis dictated by 41 C.F.R. § 304–1.5(a). That safeguard regulation requires an authorized agency official to conduct such an analysis, including but not limited to an examination of six enumerated factors designed to support a decision that the reimbursement

> shall not be accepted if the authorized agency official determines that acceptance under the circumstances would cause a reasonable person with knowledge of all the facts relevant to a particular case to question the integrity of agency programs or operations.

41 C.F.R. § 304–1.5(a). A major factor in that determination is "[t]he monetary value and character of travel benefits offered by the non-Federal source." 41 C.F.R. § 304–1.5(a)(6). Thus, the propriety of lavish accommodations must be considered by the agency in accepting reimbursement. So literally is the agency in control of the decision to accept reimbursement that payment (other than payment in kind)

> shall be by check or similar instrument made *payable to the agency*. Any such payment received by the employee on behalf of the agency for his/her travel and/or that of the accompanying spouse is accepted on behalf of the agency and is to be submitted as soon as practicable for credit to the agency appropriation applicable to such expenses.

41 C.F.R. § 304–1.6(a) (emphasis added).

In short, when the agency's objective is viewed as part of a "big picture" instead of

through the majority's tightly refracted assumption that a regulation can serve only a single objective, it is not underinclusive. It has in fact a tight "fit" with its objective. Granted, the regulations result in different treatment for expenses incurred in employee-chosen unofficial travel as opposed to agency-sanctioned official travel. But as it is accepted Equal Protection Clause jurisprudence that "the Constitution does not require things which are different in fact ... to be treated in law as though they were the same," *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940), the same logic must apply in the case of an underinclusiveness analysis of expressive activity restriction. The law does not require that regulations include all things, only like things.[2]

The provision for an agency receiving reimbursement for the cost of its employee's official travel is especially fitting in the case of the EPA. The EPA operates under a statutory charter contemplating "that each person should enjoy a healthful environment and *that each person has a responsibility to contribute to the preservation and enhancement of the environment.*" 42 U.S.C. § 4331(c) (1988) (emphasis added). In pursuit of this broad goal, EPA acts to implement policy derived in the first instance by the Council on Environmental Quality, a council authorized expressly by statute to "accept reimbursements from any private, nonprofit organization or from any department, agency, or instrumentality of the Federal government, any State, or local government, for reasonable travel expenses incurred by an officer or employee of the Council in connection with his attendance at any conference, seminar, or similar meeting conducted for the benefit of the Council." 42 U.S.C. § 4346a.

In other contexts, Congress has reminded the EPA of its duty to operate jointly with both educational and other private sector interests. Congress has expressly provided that:

> The Federal Government, acting through the coordinated efforts of its agencies and with the leadership of the Environmental Protection Agency, should work with local ... educational and environmental organizations, noncommercial educational broadcasting entities, and private sector interests to develop programs to provide increased emphasis and financial resources for the purpose of attracting students into environmental engineering and assisting them in pursuing the programs to complete the advanced technical education required to provide effective problem solving capabilities for complex environmental issues.

20 U.S.C. § 5501(a)(9) (1988). Fundamental government tenets of efficiency and propriety dictate that it is always a legitimate government objective to attempt to prevent the reality and appearance of conflicts of interest by government employees while at the same time protecting the public fisc. Given the EPA's special role in overseeing the joint responsibilities of the public and private sectors in protecting the environment, it would seem especially appropriate that, in the carrying out of that official business, the government might tap private resources for reimbursement of its costs in providing travel expense reimbursement to its employees. Since the agency does not bear the same obligation as to the unofficial travel of its employees, its goals are not met by reimbursement of an obligation it never incurred in the first place.

### D.  *Overinclusiveness?*

The majority also suggests that the regulations are invalid by reasons of overinclusiveness. I am not certain why. The majority

---

**2.** The majority describes my analysis of the government interest as "freshly minted," Maj. Op. at 98, and as "conjured by the dissent." To the contrary, I am looking at the same government justification offered from the beginning and noted by the majority: "Appellees [have] urged primarily that the regulations represent an attempt to 'protect against the appearance of impropriety the actions of their employees.'" Maj. Op. at 94

(quoting *Sanjour v. EPA,* 786 F.Supp. 1033, 1037 (D.D.C.1992)). That I read that goal as protected by the challenged regulations taken in conjunction with the government's other travel regulations renders my description of the government's goals no more freshly minted than the majority's characterization of the same governmental interest.

premises the overinclusiveness section of its opinion on the inarguable proposition that "the government's interest in restricting speech must be balanced against the interests of the employee and the public in the entire category of speech potentially suppressed." Maj. Op. at 97 (citing *NTEU*, —— U.S. at ——, 115 S.Ct. at 1014). To that end, the majority concludes, and I do not disagree, that "the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Id.* (citing, for comparison, *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)).

The majority then does not explain how the instant regulations transgress these principles, other than to assert that "the extraordinary reach of the challenged regulations places a heavy justificatory burden on the government...." Maj. Op. at 97. In support of this otherwise unexplained proposition, the majority cites *NTEU.* Granted, that opinion struck down the statutory honoraria ban of the Ethics Reform Act of 1989, 5 U.S.C. § 101 *et seq.* (1988 Supp. V), as overinclusive. However, as I noted above, it did so in an opinion that expressly stated that this court's prior remedy to that overinclusiveness had been "itself arguably overinclusive." *NTEU,* —— U.S. at ——, 115 S.Ct. at 1018. In identifying the arguable overinclusiveness of our remedy, the Supreme Court pointed out that our injunction against enforcement of the statute "prohibits enforcement of the statute even when an obvious nexus exists between the employee's job and either the subject matter of his or her expression or the interest of the person paying for it." *NTEU,* —— U.S. at ——, 115 S.Ct. at 1018. Here the agencies have designed regulations applying only where such "an obvious nexus exists between the employee's job and ... the subject matter of his or her expression...." The majority has not explained what it is about these regulations that leaves them still overinclusive when that nexus requirement is met. Nor do I see that flaw. I therefore would uphold the regulations against the challenged overinclusiveness.

## E. *"Threat of Censorship"*

At the heart of the appellant's challenge to these regulations and the majority's adoption of that challenge is a fear that the agency, in distinguishing between appearances which it will sanction as "official" and those from which it will withhold that blessing, may be exercising a viewpoint-based censorship designed to prevent employees from exercising their right to speak out on matters of public concern, and thereby depriving the public of its right to hear these informed viewpoints.

Granted, it may be that the agency is enforcing the regulations in a discriminatory manner amounting to censorship. If that is the case, then the courts are open to an individual challenge to the agency's application of the statute to them. Indeed, such a challenge now pends in the district court. This leads to another instance of semantic disagreement between the majority and me. The majority spends several pages of its analysis on the proposition that my opinion for the panel and the district judge's opinion for the trial court erroneously described the remaining challenge in the district court an "as applied" challenge. Perhaps our styling is not strictly in compliance with the phrase "as-applied challenge" in a term of art sense. Nonetheless, the fact remains that under the rubric of "selective enforcement" or "selective prosecution," count VI of the complaint alleges that the regulations are being applied to the plaintiff/appellants "in violation of the laws and Constitution of the United States."

The factual underpinnings of count VI are by precise incorporation the same factual allegations that underpin the facial First Amendment challenge. Thus, whether or not the pending count is styled an "as-applied" First Amendment challenge, it challenges the constitutionality of the regulations as applied to the plaintiff/appellants on the basis that the selection of them as targets constitutes a violation of their First Amendment rights. I do not know why in this day of notice pleading it makes any difference to the majority that the count is styled "a selective enforcement and selective prosecution of the plaintiffs" rather than an "as-applied" challenge. The question of whether these

regulations are being or have been unconstitutionally applied to these plaintiffs is currently before the trial court.

I suggest that the challenge to the application of the regulations, however styled, is the proper place to determine whether censorship of their First Amendment activities is occurring. As the Supreme Court noted in *NTEU*, "although the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." —— U.S. at ——, 115 S.Ct. at 1018 (citations omitted).

CONCLUSION

Congress, as well as the agencies to which Congress delegates its legislative authority, "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *NTEU*, —— U.S. at ——, 115 S.Ct. at 1012; *See Chevron v. NRDC*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82. In this case, EPA and GSA have imposed a lawful restriction on the work-related speech of EPA employees. The regulations at issue, when properly viewed in light of legitimate governmental objectives of furthering efficiency and avoiding appearances of impropriety, are neither overinclusive nor underinclusive. They simply mandate that an EPA employee serve but one master while at the same time protecting the public fisc. The majority's attempt to confine this case within the narrow purview of *NTEU* should fail for the reasons expressed by the Supreme Court therein. That which the NTEU honoraria ban lacked, i.e., a requirement that the regulated speech be connected to the employee's official duties, saves the regulations here.